Filed 9/10/14  P. v. Ramos CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B250000 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. NA093937) |
| CESAR ANTONIO RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson Ong, Judge.  Affirmed in part, reversed in part and remanded with directions.

Jennifer Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Cesar Antonio Ramos of robbery. In a bifurcated proceeding, the trial court found true special allegations Ramos had suffered one prior serious felony conviction and had served six separate prison terms for felonies. The court sentenced Ramos to an aggregate state prison term of 21 years. On appeal, Ramos contends the investigating officer's identification testimony was improperly admitted and the evidence was insufficient that a prior Illinois robbery conviction qualified as a serious felony under California law. We reverse in part and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Jose Olivares testified at trial that on the night of the robbery, he was working as a clerk at a convenience store. At around 11:00 p.m., Ramos and a male companion entered the store and took some beer from a beverage cooler. Ramos's companion left the store without paying for the beer. When Ramos approached, Olivares noticed he was cradling a three-pack of Budweiser beer in his arm, under his red jacket.[1] Ramos also had a roll of Mentos candy in his hand. Olivares asked Ramos if he intended to pay for the beer his companion had stolen. Ramos made an obscene hand gesture and walked out of the store without paying for the beer and the candy. Olivares followed Ramos into the parking lot, demanded he return the beer and attempted to grab it from Ramos. In response, Ramos cursed, pushed Olivares and fled with the beer. Olivares returned to the store and activated the security alarm to summon police.

David Coley testified that at about this time, he was in his car at a traffic light and saw two men walk out of a convenience store.[2] One of the men was wearing a uniform like those worn by convenience store clerks. The other man threw a punch at the clerk and ran down the street, carrying something in his hand. Coley followed the man and at one point saw him remove his red jacket and replace it with a black sweater. Coley

---

[1]     Various witnesses described this article of clothing as a jacket, a sweatshirt and a sweater. For purposes of clarity and consistency, we refer to it as a jacket.

[2]     Coley was unable to identify Ramos in court as one of the two men he saw outside the convenience store.

2

telephoned the police emergency operator, reported what he had seen and flagged down Long Beach Police Officer David Ebell, who was responding to the reported robbery.[3]

Officer Ebell testified that after speaking with Coley, he saw Ramos at a nearby intersection, holding a red jacket. Ebell detained Ramos and ordered him to put the jacket on the ground. Ebell realized Ramos had been carrying a three-pack of Budweiser beer inside the jacket.

Shortly thereafter, officers conducted an in-field show up, at which Olivares identified Ramos as the perpetrator. Olivares saw the three-pack of Budweiser beer and a red jacket Ramos had been wearing on the ground. Following Ramos's arrest, officers found a roll of Mentos candy in his jacket pocket. Ramos did not have cash or a debit card in his possession.

Ramos neither testified nor presented other evidence in his defense. Ramos's defense theory was he did not steal the beer; it belonged to him and he used no force against Olivares when Olivares attempted to grab the beer from him.

**DISCUSSION**

1. *Detective Gonzalez's identification of Ramos in Surveillance Video*

    a. *Factual background*

The convenience store manager showed Long Beach Detective Fermin Gonzalez videos recorded by the store's interior and exterior surveillance cameras showing Ramos and his companion inside the store. The manager told Gonzalez she was unable to make him a copy of the video at the time. Gonzalez subsequently secured a copy of the video recorded by the exterior camera. Gonzalez later learned the videos from all the cameras were corrupted and could not be viewed.

Prior to trial, defense counsel sought to exclude Detective Gonzalez's testimony of the contents of the damaged videos on various statutory grounds. He also argued the

---

**3** A recording of Coley's telephone call with the police emergency officer was played for the jury.

admission of the detective's testimony would violate Ramos's Sixth Amendment right to confrontation. The trial court denied the motion.

At trial, Detective Gonzalez testified the video from the interior surveillance camera showed a Hispanic man and a black man enter the store and remove items from the beverage cooler. Olivares motioned to the men, and the Hispanic man turned, made an obscene gesture and walked out the store. Olivares turned towards the black man, who was wearing a red jacket. The two men engaged in "some interaction" and the black man left the store. Gonzalez identified Ramos to the jury as the black man he saw in the store video. He also testified the red jacket worn by Ramos in the video resembled the jacket recovered by officers following the robbery. Gonzalez testified the video from the exterior camera showed Olivares and Ramos either on the sidewalk or in the parking lot. Following "some type of interaction" between them, Ramos walked away and Olivares returned to the store.

Ramos now contends the trial court abused its discretion, resulting in a violation of his Sixth and Fourteenth Amendment rights to due process and a fair trial, when it allowed Detective Gonzalez to identify him as one of the two men depicted in the missing surveillance video. We agree Gonzalez's lay opinion testimony should have been excluded, but conclude its admission was harmless.[4]

b. *Admission of identification testimony was an abuse of discretion*

Lay opinion testimony is admissible if it is both rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) In particular, an individual who did not witness a crime may identify a defendant from photographs and surveillance videos if the individual has prior personal knowledge of the defendant and the testimony will assist the trier of fact in determining the identity issue. (*People v. Ingle* (1986) 178 Cal.App.3d 505, 513 (*Ingle*); *People v.*

---

[4]    Although not among defense counsel's stated grounds for excluding Gonzalez's testimony was that it constituted inadmissible identification opinion testimony, we find the People's forfeiture argument is unpersuasive. Counsel's objections were sufficient to preserve the issue for appellate review.

*Mixon* (1982) 129 Cal.App.3d 118, 128 (*Mixon*); *People v. Perry* (1976) 60 Cal.App.3d 608, 614-615 (*Perry*).)  The question of the degree of personal knowledge goes to the weight, rather than to the admissibility of the opinion.  (*Perry,* at p. 613.)  We review a trial court's admission of lay opinion testimony on identification for abuse of discretion.  (*People v. Thompson* (2010) 49 Cal.4th 79, 128-130.)

The robbery victims in both *Mixon* and *Perry* could not clearly see the robbers during the crime and thus could not identify them in surveillance videos or in-person lineups.  The trial courts in these cases properly admitted the lay opinion testimony of police officers identifying the defendants as the robbers in a surveillance video (*Perry*) and a photograph (*Mixon*) shown to the jury.  The officers predicated their identifications upon personal knowledge of the defendants from contacts before the robberies had occurred, which aided the juries because each defendant had altered his appearance prior to trial.  (*Mixon*, *supra*, at p. 130; *Perry*, *supra* at p. 613.)

*Ingle* involved a robbery victim, who was able to see the robber during the crime.  (*Ingle, supra,* 178 Cal.App.3d at pp. 508-509.)  The trial court properly admitted the victim's opinion testimony identifying the defendant as the robber in a surveillance video shown to the jury.  (*Id.* at p. 514.)  Her identification testimony satisfied *Mixon* and *Perry* because it was based upon her observations and perceptions of him during the robbery.  (*Ibid*.)  The video was of such poor quality that it alone was insufficient to establish the robber's identity conclusively.  (*Ibid.*)

More recently in *People v. Larkins* (2011) 199 Cal.App.4th 1059, a witness, who was not a victim or police officer, was permitted to testify the defendant shown in a surveillance video was the same man the witness had previously seen in numerous other surveillance videos, although the witness had never before seen the defendant in person, and the videos had since been erased.  (*Id.* at p. 1065.)  The court distinguished *Mixon* and *Perry* as involving photographs rather than videos, noting, "It is one thing to see a single photo of a person and attempt to identify that person based on it.  But, here, the manager saw 20 to 30 videos of defendant, during which time he could observe such distinguishing characteristics as defendant's posture gait and body movements."  (*Id.* at

5

p. 1067.)  The court concluded, that "whatever the holdings of *Perry* and *Mixon*, they are logically inapplicable to videos," adding the jury could compare the witness's identification testimony with five photographs taken from the videos and admitted into evidence.  (*Id.* at p. 1067, 1068)

The trial court abused its discretion when it allowed Detective Gonzalez to identify Ramos in the surveillance video because only one of the two prerequisites for admission was met.  Unlike in *Mixon*, *Perry*, *Ingle* and *Larkins*, here there was no evidence Gonzalez had personal knowledge of Ramos's appearance, at or before the time the surveillance videos were recorded, upon which to base his identification of Ramos as the perpetrator.  Gonzalez never testified he was familiar with Ramos from earlier contacts or had previously seen Ramos or photographs/videos of Ramos at any time before the robbery or even prior to testifying at trial.[5]  The present case also differs from those earlier cases because the video had not been preserved for the jury to view which, while not a prerequisite to admission of Gonzalez's opinion testimony, would have enabled the jury to test his identification of Ramos.

c. *The erroneous admission of the testimony was harmless error*

Nonetheless, the erroneous admission of Detective Gonzalez's identification opinion testimony does not require reversal because it was harmless.  (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 82-83 [admission of lay opinion testimony was harmless error].)  At best, Gonzalez's opinion testimony was cumulative of Olivares's identification of Ramos as having been in the convenience store that night, which was never in dispute.  In view of the abundant physical and testimonial evidence linking Ramos to the robbery, it is not reasonably probable he would have obtained a better result

---

**5**     In his preliminary hearing testimony, Gonzalez answered, "Yes" to the prosecutor's question, "The male Black that Mr. Olivarez described [to you], is that the defendant?"  On cross-examination, Gonzalez testified only that he had watched the videos taken by the store's interior and exterior surveillance cameras.  He did not describe their contents.

absent the error. (See Cal. Const. art VI § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

  2. *The Trial Court Erred in Finding Ramos's Prior Illinois Conviction Qualified as a Serious Felony*

   a. *Factual background*

  Ramos's alleged prior serious felony was a 1979 Illinois robbery conviction (case No. 7918550). During the court trial on the special allegation, the People introduced records of the Illinois conviction to prove it constituted a serious felony under the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d) and section 667, subdivision (a)(1).)[6] These records consisted of:

  (1) a four-page certified document from the Department of Police, City of Chicago, listing Ramos's arrests, charges and dispositions from November 14, 1978 through April 13, 1992. The People referenced the second entry on the second page, indicating Ramos's conviction for armed robbery in case no. 7918550; the last page contains an image of Ramos's fingerprints (Exhibit 12);

  (2) A four-page digitized copy of a document from Los Angeles County Superior Court case no. NA025835; the packet contained an information sheet from the Office of the State's Attorney, Cooks County, Illinois referencing case no. 7918550, the concomitant "Order of Sentence and Commitment to Illinois Department of Corrections" documenting Ramos's guilty plea to robbery in that case and three-year sentence to the Illinois State Penitentiary, and the attached "Official Statement of Facts," which reads, "On October 28, 1979, victim was walking on the street with his girlfriend when defendant approached victim, held a gun on him, and took $16.00. Defendant forced victim and his girlfriend to the ground and kicked them. Defendant ran away and one block away hit three men in the face, one with a gun." The document was signed by the "Assistant State's Attorney" of Cook County, Illinois (Exhibit 13).

  (3) A seven-page certified document for Los Angeles Superior Court case No. NA025835, including a minute order dated November 1, 1995, showing Ramos pleaded

---

[6]    Statutory references are to the Penal Code, unless otherwise indicated.

no contest to burglary and sentenced as a second strike offender to 32 months in state prison (Exhibit 14).

The trial court admitted exhibits 12 and 13, over defense objections, and found all of the exhibits established Ramos had suffered a 1979 Illinois conviction for robbery (case No. 7918550), which qualified as a serious felony under the three strikes law and section 667, subdivision (a)(1). The court thereafter sentenced Ramos to an aggregate state prison term of 21 years: Ten years for robbery (the upper term of five years doubled under the three strikes law) plus five years for the prior serious felony enhancement, plus six years for the one-year prior prison term enhancements.

> b. *Governing law*

A defendant who has suffered a prior conviction for a serious or violent felony is subject to sentencing under the three strikes law. Similarly, a defendant who has been convicted of a serious felony and has suffered a prior conviction for a serious felony is subject to a mandatory five-year sentence enhancement for each prior serious felony conviction that was brought and tried separately. (§ 667, subd. (a)(1).) Prior convictions from other jurisdictions may qualify for similar treatment provided certain requirements are met: Specifically, a prior out-of-state felony conviction may qualify as a strike if the foreign offense includes "all of the elements" of the particular felony in California and that felony is identified under California as a serious felony (§ 1192.7, subd. (c)) or a violent felony (§ 667.5, subd. (c)). (See §§ 667, subd. (d)(2); 1170.12, subd. (b)(2); *People v. Warner* (2006) 39 Cal.4th 548, 552-553.) Similarly, a prior felony conviction from another jurisdiction may be used to support a sentence enhancement under section 667, subdivision (a)(1), if the out-of-state offense "includes all of the elements" of a serious felony as defined in California. (§ 667, subd. (a)(1); *Warner,* at p. 553.)

It is the conduct that comprises the out-of-state offense that matters, not the label the foreign jurisdiction gives the offense. (See *People v. McGee* (2006) 38 Cal.4th 682, 691 ["a conviction from another jurisdiction must involve conduct that would qualify as a serious" or in the case of the three strikes law, violent, felony in California]; *People v. Avery* (2002) 27 Cal.4th 49, 52 [same].) In determining whether a prior out-of-state

8

felony conviction qualifies as a serious or violent felony in California, the trier of fact may look to the entire record of conviction, but no further.  (*People v. Trujillo* (2006) 40 Cal.4th 165, 179-180.)  When the record does not disclose the facts of the offense actually committed, the court must presume the prior conviction was for the least offense punishable under the foreign law.  (*People v. Guerrero* (1988) 44 Cal.3d 343, 352; *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1116-1117.)

Robbery under California law is a serious felony within the meaning of both the three strikes law and section 667, subdivision (a)(1).  Under section 211, "[r]obbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  An essential element of the crime is "the intent to permanently deprive the person of the property."  (*People v. Marshall* (1997) 15 Cal.4th 1, 34; see *McGee,* at p. 688.)  By contrast, in Illinois, a "person commits robbery when he or she knowingly takes property, . . . , from the person or presence of another by the use of force or by threatening imminent use of force."  (§ 720 ILCS 5/18-1.)  Robbery in Illinois is a general intent crime; specific intent to permanently deprive is not an element of the offense.  (*People v. Banks* (1979) 75 Ill.2d 383.)  In other words, because proof of robbery in Illinois may be based solely on the use of force in the taking of property, regardless of the intent or the anticipated duration of the taking, the least adjudicated elements of an Illinois robbery do not equate to a robbery within the meaning of section 211.

The People presented records of 1979 Illinois robbery conviction to bridge the gap between the Illinois and California statutory definitions.  Specifically, Exhibits 12, 13 and 14 were introduced at the court trial to prove the existence, date, punishment and statutory authority for the robbery conviction.  However, the only information in the record reflecting the facts underlying the 1979 conviction was an "Official Statement of Facts" that apparently was prepared by an Illinois state assistant attorney for purposes of sentencing.  The Official Statement of Facts described an armed robbery Ramos committed against a man that he encountered on the street in October 1979.  However nothing suggests this document was part of the guilt adjudication process, or that it was

9

subject to a valid hearsay exception. Under these circumstances, the Official Statement of Facts was not admissible to show the 1979 robbery conviction qualified as a serious felony under California law. (See *People v. Reed* (1996) 13 Cal.4th 217, 230-231 [probation report's hearsay recitation of facts was inadmissible to prove criminal act underlying prior conviction].) Thus, the finding this offense constituted a serious felony for sentencing purposes must be reversed.

3. *The Prior Strike and Prior Serious Felony Allegations May Be Retried*

"There is no double jeopardy bar to a retrial on a prior conviction allegation in a noncapital sentencing proceeding." (*People v. Cortez* (1999) 73 Cal.App.4th 276, 284, fn.7; see, e.g. *People v. Barragan* (2004) 32 Cal.4th 236 [concluding that retrial of a strike allegation is permissible where a trier of fact finds the allegation to be true, but an appellate court reverses that finding for insufficient evidence].) Consequently, we remand to permit the People at a new trial to present admissible evidence establishing the 1979 Illinois robbery conviction is a serious felony within the meaning of the three strikes law and section 667, subdivision (a)(1).

**DISPOSITION**

The true findings as to the allegations that Ramos's 1979 Illinois robbery conviction is a conviction for a serious felony within the meaning of the three strikes law and section 667, subdivision (a)(1), are reversed, and Ramos's sentence is vacated. In all other respects the judgment is affirmed. The matter is remanded for future proceedings not inconsistent with this opinion.


ZELON, J.


We concur:


WOODS, Acting P. J.


SEGAL. J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.