[No. E050725. Fourth Dist., Div. Two. Oct. 4, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDY ALAN LARKINS, Defendant and Appellant.

**COUNSEL**

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Heidi T. Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RAMIREZ, P. J.**—A jury convicted defendant, Randy Alan Larkins, of five counts of second degree commercial burglary (Pen. Code, § 459),[1] four counts of receiving stolen property (§ 496, subd. (a)) and one count of identity theft (§ 530.5, subd. (a)). He was sentenced to prison for six years four months and appeals, claiming certain opinion evidence should have been excluded. We reject his contention and affirm.

## FACTS

An LA Fitness gym member testified that on September 18, 2008, he locked, inter alia, his driver's license into a locker at the Upland LA Fitness and an hour later, the lock and the license were gone. He denied knowing defendant or giving defendant permission to go into his locker or to possess his driver's license. On November 3, 2009, a California Highway Patrol officer stopped defendant's 1993 green Jeep Cherokee for not having a registration since 2005, arrested defendant for not having a valid driver's license and impounded the vehicle. On November 16, 2009, the secured impounded vehicle was searched and the aforementioned victim's driver's license was found inside. Defendant was convicted of the September 18, 2008 commercial burglary of the gym and of receiving stolen property on November 3, 2009, based, in part, on this evidence (counts 9 and 10).

Another LA Fitness gym member testified that on September 27, 2009, he locked his clothes and wallet, the latter of which contained, inter alia, his auto club card, into a locker at the LA Fitness in Upland and when he returned, the lock and his possessions were gone. He denied knowing defendant or giving defendant permission to enter his locker or to possess his auto club card. During the search of defendant's vehicle, which followed its stop on November 3, 2009, this victim's auto club card was found. Defendant was convicted of the September 27, 2009 commercial burglary of the gym and of receiving stolen property on November 3, 2009, based, in part, on this evidence (counts 7 and 8).

A Bally's gym member testified that on October 1, 2009, he locked his fanny pack, which contained personal papers, into a locker at the Bally's in San Bernardino and when he returned, the lock and fanny pack were gone.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

He denied knowing defendant or giving defendant permission to go into his locker or to possess his property. During the search of defendant's vehicle, which followed its stop on November 3, 2009, this victim's personal papers were found. Defendant was convicted of the October 1, 2009 commercial burglary of the gym and of receiving stolen property on November 3, 2009, based, in part, on this evidence (counts 5 and 6).

Another member of Bally's gym testified that on October 28, 2009, he locked his property into a locker at the Bally's in Rancho Cucamonga and when he returned, the lock and the property were gone. He denied knowing defendant or giving defendant permission to go into his locker or to possess his property. During the search of defendant's vehicle, which followed its stop on November 3, 2009, the victim's property was found. Defendant was convicted of the October 28, 2009 commercial burglary of the gym and of receiving stolen property on November 3, 2009, based, in part, on this evidence (counts 3 and 4).

A member of 24 Hour Fitness testified that on August 24, 2009, he locked his property into a locker at the 24 Hour Fitness in Corona and when he returned, the lock and his property, including his gym membership card, were gone. He denied knowing defendant or giving him permission to use his gym membership card. He also denied using his card at the 24 Hour Fitness in Montclair on October 27, 2009. The 24 Hour Fitness loss prevention manager identified defendant as being seen on a video at the Montclair location on October 27, 2009, providing a membership card to gain access to the gym, then placing it into his backpack. The jury was shown the video. The manager testified that the data collected by the gym showed that this victim's gym card had been used to gain entry to the gym at the same time the video showed defendant using a membership card to enter the gym. Defendant was convicted of identity theft based, in part, on this evidence (count 2).

Another member of 24 Hour Fitness testified that on October 27, 2009, he locked a gym bag containing his possessions in a locker at the Montclair 24 Hour Fitness and when he returned, the lock was gone and his empty gym bag was sitting on the sink in the locker room. He denied knowing defendant or giving him permission to go into his locker. The above mentioned videotape showed defendant entering the gym at 1:32 p.m. and heading directly for the locker room. A second videotape showed defendant entering the locker room at 1:33 p.m., leaving it at 1:36 p.m. and almost immediately exiting the front door of the gym. The jury was shown the video. Defendant

was convicted of the October 27, 2009 commercial burglary of the gym based, in part, on this evidence (count 1).

On November 11, 2009, a detective accosted defendant and asked defendant if he could speak to him. Defendant asked the detective if he was in trouble. Defendant denied visiting the Montclair 24 Hour Fitness. The detective showed defendant still photographs made from the above mentioned videos and told defendant he thought defendant was depicted in them. Defendant neither denied nor admitted that this was true. The detective arrested defendant and told him that he wanted to recover the important items that had been taken from the victim of the Montclair burglary. Defendant asked several times what he would receive in exchange for cooperating. Defendant wanted a guarantee that he would not return to jail. Defendant described one of the victim's important items to the detective and said that it had been burned and the detective should not worry about what defendant was going to do with it in response to the detective's expression of concern about it. Defendant added, "that when he breaks into lockers, he does not know what's in them, and he . . . explained that if [the detective] was concerned that those important items would be used for something that [the detective] was concerned with, [the detective] should not be concerned, because that wouldn't be [defendant's] intent."

The 24 Hour Fitness loss prevention manager testified that defendant was not a member of 24 Hour Fitness.

In addition to the items already noted that were found in defendant's vehicle on November 16, 2009, there were driver's licenses and keys that did not belong to defendant, Bally's and LA Fitness membership cards and an auto club card that were not in his name.

Defendant's booking photo, taken on November 11, 2009, was admitted into evidence.

Over defendant's objection, the trial court admitted evidence under Evidence Code section 1101, subdivision (b) to show identity, intent and knowledge. That evidence began with the testimony of another 24 Hour Fitness member that on January 1, 2008, items, including a credit card, had been stolen from his locked locker at the Rancho Santa Margarita club and that he made no purchases that day at Target, Vons or CVS. He did not know defendant or give defendant permission to enter his locker or use his credit

card at any of these stores. A detective who obtained videos from the gym and the stores testified that the same person appeared in all four videos and that person was defendant. Defendant pled guilty to all four burglaries, saying, "I willfully and unlawfully entered . . . 24 Hour Fitness, Target, Vons and CVS . . . with the intent to steal."

The trial court also admitted under Evidence Code section 1101, subdivision (b) the testimony of an investigator that in November 2008, he searched defendant's green Jeep Cherokee and found 12 membership cards from Bally's and 24 Hour Fitness, mail, driver's licenses and credit cards in names other than defendant's, along with a DMV document in defendant's name. He arrested defendant and, on the way to the station, defendant said that the last time he was released from jail, he wanted to stop stealing from 24 Hour Fitness. He added that he wanted to tell officials from 24 Hour Fitness that the locks they supplied their members were easy to break off and because they had made it so easy, he continued to steal from their gyms. Once at the station, defendant said that if he had been truthful, he would have been sent away for a very long time. He added that he should be taken straight to jail. Another investigator who was at the scene of the search of defendant's vehicle testified that defendant said that after he was sentenced, he wanted to get together with the officers and educate them on how easy it was to break into lockers at 24 Hour Fitness.

Under Evidence Code section 1101, subdivision (b), another 24 Hour Fitness member testified that on October 29, 2009, his possessions and the lock from a locker at the Yorba Linda 24 Hour Fitness were taken between 11:00 a.m. and noon. He found all his possessions, except his wallet, which contained, inter alia, an American Express card, in another locker. That card was used the same day to purchase four tires in the same strip mall where the gym was located. This victim denied purchasing the tires and denied knowing defendant or giving him permission to go in his locker or use his American Express card. The loss prevention manager from 24 Hour Fitness testified that the person on a video seen at the front desk of the Yorba Linda site at 12:04 p.m. on October 29, 2009, was defendant, and he had a backpack. The video further showed defendant handing the receptionist a membership card, which was scanned and returned to him. Defendant next entered the locker room and left it at 12:08 p.m. The video was shown to the jury and admitted into evidence. 24 Hour Fitness data show that a membership card which had been stolen from a locker at the Newport Beach site the previous month was scanned at the Yorba Linda site at 12:04 p.m. on October 29, 2009. The man who sold the tires that were purchased with the stolen American Express card identified defendant as the person who presented this card as payment and walked off with the tires, claiming he did not then have enough time to have them installed on his 1993 green Jeep Cherokee, but never returning to have them installed. A receipt for the tires in this victim's name with a description

of defendant's jeep was found in that vehicle when it was searched on November 16, 2009. Also in connection with this offense, another 24 Hour Fitness member testified that in September 2009, his membership card, along with other items, had been stolen from his locked locker at the Newport Beach site. He denied ever going to the Yorba Linda site and he denied knowing defendant or giving defendant permission to enter his locker or use his membership card to enter the Yorba Linda site.

As already stated, the loss prevention manager identified defendant in the video that had been made at the Yorba Linda site in October 2009, and in the videos that had been made at the Montclair site the same month. When asked by the prosecutor how he was able to recognize defendant in the latter, the manager testified that it was from previous incidents and arrests, and that he looked at videos in response to complaints about lockers being burglarized. Over defense objection, he testified that he had seen defendant approximately 20 to 30 times in videos. He went on to explain that "once . . . the initial Randy Larkins case was dispositioned and he was arrested and convicted" the manager deleted the videos, but saved five sets of still pictures from some of them, which were admitted into evidence.

In connection with one of the sets, the manager testified that the pictures showed defendant entering an Orange County club on August 17, 2007. He testified that another set of pictures showed defendant entering a Glendora club in August 2007 and going into the locker room. In another set, the manager testified that defendant is seen entering a Huntington Beach club at 2:43 p.m. on January 20, 2008, getting a membership card scanned, heading to the locker room and leaving the locker room in a little over four minutes. The next set showed the same, only at the club in Monrovia on September 7, 2008. Defendant was in and out of the gym within 10 minutes on that occasion, exiting just after leaving the locker room. The last set showed defendant entering the Fontana club on September 29, 2008, at 4:35 p.m., heading to the locker room and being in the locker room at 4:48 p.m. The manager added that defendant always had a backpack with him. The manager testified that he had never seen defendant in person.

### ISSUE AND DISCUSSION

Before trial, defendant moved to exclude the testimony of the 24 Hour Fitness loss prevention manager that he recognized the man in the video from the Montclair club as defendant because he had seen defendant in 20 to 30 videos from other clubs. The ground on which defendant moved below to exclude this evidence, as is pertinent to this appeal, was that it lacked sufficient foundation, in that because the manager had never seen defendant in person, his identification of him in the 20 to 30 videos was speculative.

The trial court ruled that the manager's testimony was admissible, reasoning, "He's looked at videos. He believes every time he's seen the video[,] he's seen someone that looks like the same person. . . . [H]e doesn't know if it's [defendant] or [the trial judge]. He just knows it's the same person that he's seen in the videos. Then he's looked at these other videos, he saw a photo show-up . . . , or a booking photo [of defendant], and said[, 'Y]ep, that's the person that I recognize that I see in all the videos.'" At trial, defendant unsuccessfully objected to the manager's identification of defendant on the Montclair video on the grounds of speculation and lack of foundation. The manager went on to testify that he was able to recognize defendant in that video from previous incidents and arrests.

Defendant here contends that the trial court abused its discretion in admitting the manager's testimony concerning the 20 to 30 videos over his foundation objection, citing *People v. Mixon* (1982) 129 Cal.App.3d 118, 128 [180 Cal.Rptr. 772] (*Mixon*). He contends that *Mixon* holds that "[l]ay opinion testimony as to the identity of persons depicted in surveillance photographs *or video* is only admissible if . . . the witness testifies from personal knowledge of the defendant's appearance at or before the time the photo [is] taken . . . ." However, *Mixon* does not so hold, and it, and the case it cited in support of its holding is factually distinguishable from this case.

■ In *Mixon*, two police officers were, on the day of the robbery, shown a surveillance photo of the crime and identified the defendant as one of the robbers. (*Mixon, supra,* 129 Cal.App.3d at p. 128.) The appellate court noted, "The photograph . . . is a downward shot revealing the left profile of the subject. Because, however, the subject is wearing a ski cap pulled below the earlobes, the photograph depicts the subject's face from only the middle of the nose down. The . . . photograph . . . , which was somewhat dark because of the lighting conditions, depicted an individual who had no moustache and whose sideburns were bushy and extended below the area of the mouth. . . . A booking photograph of [the defendant] . . . was taken under good lighting conditions at the time of the arrest on the day of the robbery. [The defendant's] full face and full left profile were depicted in the booking photograph. [The defendant] had no moustache but did have long, bushy sideburns." (*Mixon,* at p. 125.) The *Mixon* court reasoned, "[C]ases have recognized certain prerequisites to the admissibility of photographic identification testimony, *particularly when such testimony comes from law enforcement officers.* [¶] . . . [In] *People v. Perry* [(1976)] 60 Cal.App.3d 608 [131 Cal.Rptr. 629,] . . . [¶] . . . [¶] . . . '. . . [e]vidence was introduced that defendant, prior to trial, altered his appearance by shaving his moustache. The witnesses were able to apply their knowledge of [the defendant's pretrial] appearance to the subject [of the surveillance photograph taken at the crime scene]. . . . The opinions of the witnesses were sufficiently based upon personal knowledge to permit their introduction; *the question of the degree of*

*knowledge goes to the weight rather than to the admissibility of the opinion.*' [Citation.] . . . [¶] *Perry* thus requires [as a] predicate[] for the admissibility of lay opinion testimony as to the identity of persons depicted in surveillance photographs . . . that the witness testify from personal knowledge of the defendant's appearance at or before the time the photo was taken . . . . [¶] . . . [F]ederal cases have expressed another concern *where the lay identification testimony comes from law enforcement officials*: that such testimony will 'increase the possibility of prejudice to the defendant in that he [is] presented as a person subject to a certain degree of police scrutiny.' [Citation.] Exclusion is thus warranted if the prejudicial effect of such testimony outweighs its probative value. [Citations.] . . . [¶] . . . [¶] In view of [the officers' testimony that both had had numerous prior contacts with the defendant], it is clear that the[y] . . . possessed requisite personal knowledge of [the defendant's] appearance. . . . [*The defendant*] *had shortened his sideburns and grown a moustache between arrest and trial.*" (*Id.* at pp. 127–131, italics omitted & added, fns. omitted.)

█ It is thus clear that *Perry*'s, and, therefore, *Mixon*'s, insistence on the lay witness being familiar with the defendant prior to or at the time the picture was taken (which was during the crime) is because in each case, the defendant had altered his appearance between the crime and trial. No such alteration occurred here. What we do glean from *Perry*, and, therefore, *Mixon*, is that when law enforcement officers identify subjects of *still photos*, particular attention needs to be paid to the prejudicial impact of their testimony, a matter which is not at issue here because the manager is not a police officer and because defendant here is merely contesting the adequacy of the foundation of the testimony and not its prejudicial impact. The second thing to remember about *Perry* and *Mixon* is that they involved still photos. It is one thing to see a single photo of a person and attempt to identify that person based on it. But, here, the manager saw 20 to 30 videos of defendant, during which time he could observe such distinguishing characteristics as defendant's posture, gait and body movements. Thus, whatever the holdings of *Perry* and *Mixon*, they are logically inapplicable to videos. Finally, *Perry* and *Mixon* correctly point out that the degree of knowledge of the subject by the identifier is a matter of weight, not admissibility. At some point, which the record does not disclose, the manager saw defendant's driver's license and his booking photo[2] and, therefore knew the name of the person he was seeing in the videos. It does not matter at what point in his viewing of the videos—either before, during or after—that he saw what were indisputably photos of defendant, and then could put a name to the images he saw.

---

[2] Defendant relies on the manager's preliminary hearing testimony in this regard. The trial court either misspoke itself or believed the manager's knowledge of defendant's name came from his photo in a photo lineup and/or his booking photo.

Moreover, the jurors were able to test the manager's opinion that defendant was the person in the 20 to 30 videos because they saw still photos taken from some of the videos and they could test his ability to correctly identify defendant in the three videos they were shown. We note that defense counsel at trial, although very vocal about any objections she did have, did not object on the basis of foundation to the manager's identification of defendant on the video at the Yorba Linda 24 Hour Fitness, nor did she object to the detective's opinion that the person he saw on the videos of the Rancho Santa Margarita 24 Hour Fitness and at the Target, Vons and CVS were all the same person and that person was defendant. Nor does defendant, here, claim these opinions should not have been admitted.

Defendant points out that there was no evidence as to when defendant's booking photo and driver's license picture were taken. However, if defendant wanted to make this assertion, the time to do it was below, not here, for the first time. (Evid. Code, § 353.) Moreover, defendant was 39 years old when the earliest of these incidents occurred for which a booking photo might be made and 41 when the last charged offense occurred. Absent defendant altering his appearance, of which there is no evidence in the record, people do not change that much at that point in their lives within that short a period of time.

Defendant's assertion, in his reply brief, that the manager viewing what were indisputably defendant's photographs (his driver's license and his booking photograph) does not qualify as "acquiring knowledge 'through one's senses' by personal observation" as required by *Perry* and *Mixon*. We disagree. The manager looking at two photographs of defendant is no different than the police officers in *Perry* and *Mixon* seeing the defendants during prior contacts with them. One can be sufficiently familiar with a person by seeing photos of him to later identify him in the same or another medium. We do not doubt that a starstruck young lady who has seen pictures of Justin Bieber in magazines could easily identify him were she to see him on a video, on television or in person.

We also strongly disagree with defendant that the admission of the manager's opinion that the person on the 20 to 30 videos and the Montclair video was defendant prejudiced him. We have laid out all the evidence against defendant above. This opinion was but a small fraction of the enormous evidence against defendant. Even if the trial court had abused its discretion in admitting the opinion, we would not reverse.

### DISPOSITION

The judgment is affirmed.

Hollenhorst, J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 2011, S197615. Werdegar, J., did not participate therein.