Filed 11/7/14  In re D.N. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.N., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br> D.N., <br><br> Defendant and Appellant. | A140225 <br><br> (San Francisco City & County Super. Ct. No. JW13-6116) |

Defendant D.N., a minor, appeals after the juvenile court sustained a wardship petition (Welf. & Inst. Code, § 602, subd. (a)) alleging he committed first degree robbery (Pen. Code, § 212.5, subd. (a); count one) and assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count two).[1]  The court sustained the allegations after a contested jurisdictional hearing.  The court later granted D.N.'s motion to set aside the assault adjudication (count two).  The court declared D.N. a ward, ordered out-of-home placement, and imposed terms and conditions of probation.  D.N. contends the evidence was insufficient to prove he was the perpetrator of the robbery.  We affirm the judgment.

---

[1] The petition also alleged that, on a different occasion, D.N. unlawfully carried a concealed firearm (Pen. Code, § 25400, subd. (c)(4); count three), carried a loaded firearm in public (Pen. Code, § 25850, subd. (c)(4); count four), and resisted a peace officer in the performance of his or her duties (Pen. Code, § 148, subd. (a)(1); count five). D.N. admitted count three; counts four and five were dismissed.

# I. BACKGROUND

On January 13, 2013, R.B. was en route to a friend's house to watch a football game. While waiting at a Muni train stop, he saw a person (whom R.B. later identified as D.N.) at the stop, and they both boarded the same Muni train. R.B. said the person he saw was wearing jeans, a black jacket, and a red beanie.

During the ride, R.B. was using his mobile phone to check sports scores. When the train reached a stop, the person R.B. had seen while waiting for the train grabbed R.B.'s phone out of his hand and ran out of the train. R.B. chased the suspect off the train, around the back of the train, and then back toward the front. R.B. caught up with the suspect, grabbed the front of his jacket, and pulled him to the ground. At this point, R.B. saw the suspect was an African-American male, wore dreadlocks, and was smaller and younger than R.B.

The suspect fell on top of R.B., and they were "chest to chest." R.B. continued to hold onto the suspect, who hit R.B. five to 10 times in the face. R.B. fought back, hitting the suspect in the face. Two or three girls who had been on the train attempted to help the suspect by hitting R.B.

People on the train and on the street watched the struggle. Adults arrived and restrained the suspect and R.B. The suspect and R.B. accused each other of stealing the phone. The adults eventually decided R.B. was telling the truth and released him. The suspect dropped the phone. R.B. picked it up, recognizing it by its case.

R.B. "looked around and realized I was at a place I didn't want to be." Satisfied because he had recovered his phone, R.B. decided to leave without waiting for the police to arrive. Both R.B. and the suspect, who was also released, left the area, walking in opposite directions. R.B. estimated this was about five to 10 minutes after he grabbed the suspect.

R.B. saw that the train he had previously been riding had stopped, so he boarded it. Police officers, including Officer Antonio Santos, had responded to the scene and were on the train, and R.B. gave them a description of the suspect. The officers later drove around the area, but were unable to find R.B.'s assailant.

2

As a result of the incident, R.B. had "markings" on his face and a bruised and skinned right knee. His knee had not fully healed at the time of the jurisdictional hearing, four months after the incident.

A few days after the incident, Officer Santos and other officers watched a Muni surveillance video of the incident. Santos, who was familiar with D.N.'s appearance from seeing him on a number of occasions while patrolling the Lakeview neighborhood of San Francisco and from seeing D.N. in photographs and videos, recognized the suspect shown on the video as D.N. Santos based his identification on similarities between D.N. and the suspect, including the suspect's facial features, dreadlocks, mannerisms, black jacket with a North Face logo, and red beanie with a ball on top. When he watched the video, Santos was "[p]retty certain" the suspect shown in the video was D.N.

Police did not immediately arrest D.N. because they were unable to find him, despite looking for him throughout the Lakeview neighborhood. Police did not know his true name, knowing him only by the nickname " 'Doopa.' "

On March 5, 2013, Officer Santos saw on Facebook a photograph of D.N. with the caption " 'posted just now[.]' " Santos recognized the building in the background of the photograph, and he drove to the area, where he saw D.N. walking away. When questioned, D.N. initially gave a false name, denied knowledge of an incident on Muni and said he did not ride Muni, but ultimately told officers his name.

As we discuss below, D.N. presented a defense of mistaken identification.

## II. DISCUSSION

### A.      Standard of Review

"Our review of [D.N.'s] substantial evidence claim is governed by the same standard applicable to adult criminal cases. [Citation.] 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' [Citation.] ' "[O]ur role on appeal is a limited one." [Citation.] Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could

3

reasonably have deduced from the evidence. [Citation.] Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. [Citation.]' [Citation.]" (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) An appellate court may not reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).)

**B.     Sufficiency of the Evidence**

Substantial evidence supports the juvenile court's determination D.N. was the perpetrator. The victim, R.B., identified D.N. as the perpetrator at the jurisdictional hearing. R.B. testified he was "pretty sure," or "around 75 percent sure," D.N. was the person who robbed him. "Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Boyer* (2006) 38 Cal.4th 412, 480 (*Boyer*); see Evid. Code, § 411.) "[W]hen the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court." (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.)

In contending there was not substantial evidence, D.N. emphasizes three eyewitnesses called by the defense testified the perpetrator was a girl and was not D.N. Jessie Ho, a passenger on the train, testified a girl sitting across from her "got up quick and snatched something out of somebody's hand and she ran out, and then the guy followed after her." Ho believed the perpetrator was female, even though she wore baggy men's clothing, because Ho had several female friends who dressed like boys. When she was shown a group of photographs by defense counsel's investigator prior to trial, Ho did not recognize anyone as the perpetrator. Ho testified D.N. was not the perpetrator.

4

Sulaiman Ali, who was working as a cashier in his family's grocery store at the intersection where R.B. chased the suspect off the train, saw the fight between R.B. and the suspect. Ali testified a young black female was punching a young white male as she lay on top of him in the street. Ali testified he had never seen the victim or the perpetrator before. Ali, who had seen D.N. several times a week in the store, testified D.N. was not the perpetrator. Prior to the hearing, defense counsel's investigator showed Ali six photographs, one of which depicted D.N. Ali testified none of the photos depicted the perpetrator.

Rudy Brooks, leaving church at the same intersection, saw a Caucasian male and a female with braids fighting in the street. Brooks assisted one of the church ministers in ending the fight, which also involved another teenage girl and a younger child. Brooks was "100 percent sure" the person assaulting the Caucasian male was a girl. The girl, who wore baggy jeans and a windbreaker, "tried to portray herself as" a boy, but when she brushed against Brooks, he felt her breasts. Brooks did not recognize anyone in the photographic lineup shown to him by defense counsel's investigator. He was "110 percent sure" D.N. was not the perpetrator.

Although this testimony supported the defense of mistaken identification that D.N. presented in the juvenile court, this court may not reevaluate the perception and credibility of the witnesses. (*Ochoa, supra,* 6 Cal.4th at p. 1206.) The juvenile court could credit the testimony of R.B., who, although he did not get a good look at the perpetrator on the train, did have the opportunity and motivation to do so after the perpetrator took his phone. R.B. chased the perpetrator, struggled with the perpetrator "chest to chest" on the ground, and then stood near the perpetrator while the adults who broke up the fight restrained both of them. R.B. estimated the encounter lasted between five and 10 minutes.

D.N. contends R.B.'s previous identification of a person other than D.N. undercuts the reliability of R.B.'s in-court identification of D.N. R.B. testified that, prior to the hearing, he was shown a photographic lineup that included photographs of D.N. and five other African-American males. R.B. did not identify D.N., but instead identified a

5

different person as the perpetrator, stating he was 75 percent certain of his identification. D.N. also notes R.B. initially told the police the suspect was between five feet six inches and five feet eight inches tall, although D.N. is five feet two and one-half inches tall.

But R.B.'s inconsistent prehearing identification, and the height discrepancy noted by D.N., do not establish R.B.'s in-court identification of D.N. is not substantial evidence supporting the juvenile court's decision. It is the province of the trier of fact to evaluate a witness's in-court identification testimony in light of all relevant factors, including any prior occasions on which the witness failed to identify the defendant or made an identification inconsistent with the witness's identification at trial. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1139, fn. 9, 1143–1144 (*Wright*) [factors relevant to jury determination]; CALCRIM No. 315 [same].)

D.N. notes a testifying witness's out-of-court identification may be admissible to prove the defendant's identity as the perpetrator of a crime, and can be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court. (*Boyer, supra,* 38 Cal.4th at p. 480; see Evid. Code, § 1238.) In the context of explaining the admissibility and probative value of a witness's out-of-court identification, our Supreme Court has stated that "an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification: '[T]he [out-of-court] identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. [Citations.] The failure of the witness to repeat the [out-of-court] identification in court does not destroy its probative value . . . .' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 265.) But these observations do not establish that, when a witness makes an out-of-court identification of someone other than the defendant, the witness's in-court identification of the defendant is not substantial evidence of guilt. As noted, it is for the trier of fact to assess a witness's in-court identification testimony in light of all relevant factors, including any prior inconsistent identifications. (See *Wright, supra,* 45 Cal.3d at pp. 1139, fn. 9, 1143–1144; CALCRIM No. 315.)

6

D.N. also cites *People v. Cunningham* (2001) 25 Cal.4th 926, 989–990 (*Cunningham*), in which our Supreme Court addressed a defendant's claim that admission of identification testimony violated his federal due process rights because the witness's initial identification was based on an impermissibly suggestive photographic lineup. The *Cunningham* court stated: "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, *and, if so*, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*Id.* at p. 989, italics added; accord, *People v. Lucas* (2014) 60 Cal.4th 153, 235.)

*Cunningham* does not assist D.N. D.N. does not allege the use of any "unduly suggestive and unnecessary" identification procedure, the threshold showing necessary to establish a due process violation. (*Cunningham, supra,* 25 Cal.4th at pp. 989–990; see *Perry v. New Hampshire* (2012) ___ U.S. ___, ___ [132 S.Ct. 716, 730] (*Perry*).) Absent such an improper identification procedure, the trier of fact, not the reviewing court, generally must evaluate identification testimony based on such factors as the witness's opportunity to observe the perpetrator and the witness's certainty in making the identification. (See *Perry, supra,* ___ U.S. at p. ___ [132 S.Ct. at pp. 728–729]; *Wright, supra,* 45 Cal.3d at pp. 1139, fn. 9, 1143–1144; CALCRIM No. 315.)

Although R.B.'s in-court identification of D.N. is sufficient to support the juvenile court's finding, other evidence supports the court's determination. Officer Santos, who was familiar with D.N.'s appearance from seeing him two to three times per week between September 2012 and January 2013 while patrolling the Lakeview neighborhood and from seeing photographs and videos of D.N., identified the perpetrator in the Muni surveillance video as D.N.

7

D.N. contends Officer Santos's opinion testimony on this point was inadmissible. A person may give a lay opinion that a perpetrator depicted in a surveillance video is the defendant. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1066–1068 (*Larkins*); *People v. Ingle* (1986) 178 Cal.App.3d 505, 513.) The identifier's degree of familiarity with the subject goes to the weight, not the admissibility, of the opinion testimony. (*Larkins, supra,* at p. 1067.) We review the admission of such testimony for abuse of discretion. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127 (*Mixon*).)

D.N. argues Santos was not sufficiently familiar with D.N.'s appearance to identify him as the perpetrator shown in the video, because he had never spoken with or arrested D.N. and had observed him only from a distance. But, as noted, Santos was familiar with D.N. from observing him regularly in the Lakeview neighborhood and from seeing him in photographs and videos. Questions about whether Santos had seen D.N. enough times or observed him closely enough to identify him as the suspect in the video went to the weight, not the admissibility, of the officer's testimony. (*Larkins, supra,* 199 Cal.App.4th at p. 1067.)

D.N. also contends Officer Santos's testimony should have been excluded under *Mixon*, because other witnesses were available to testify as to the identity of the perpetrator. In *Mixon*, the appellate court noted there is an increased possibility of prejudice when lay identification testimony comes from law enforcement, because such testimony presents the defendant " 'as a person subject to a certain degree of police scrutiny.' " (*Mixon, supra,* 129 Cal.App.3d at p. 129.) A trial court may exclude such testimony under Evidence Code section 352 if its prejudicial effect substantially outweighs its probative value. (*Mixon,* at pp. 129, 134–135.) The *Mixon* court noted a federal decision expressing the "caveat" that " '. . . use of lay opinion identification by policemen or parole officers is not to be encouraged, and should be used only if no other adequate identification testimony is available to the prosecution.' " (*Id.* at p. 129, quoting *United States v. Butcher* (9th Cir. 1977) 557 F.2d 666, 670.) But the *Mixon* court cautioned: "This opinion should not be interpreted to stand for the proposition that if

8

non-law enforcement testimony is available, law enforcement identification testimony must be excluded." (*Mixon, supra,* at p. 134.)

We find no abuse of discretion by the juvenile court in admitting Officer Santos's testimony. As noted, D.N. vigorously challenges the adequacy of the other identification testimony introduced by the prosecution, i.e., R.B.'s testimony. As to the testimony of Ho, Ali and Brooks, we do not interpret *Mixon* as holding the court must exclude police identification testimony whenever the defendant presents *contrary* testimony as to the identity of the perpetrator. (See *Mixon, supra,* 129 Cal.App.3d at p. 134 [prosecution should not be forced to rely on "weak" identification testimony].)

D.N. also points to what he claims are discrepancies in Officer Santos's testimony. Santos testified D.N. often wore a North Face jacket and a beanie with a ball on top; in the Muni video, the suspect wore a jacket that appeared to Santos to have a North Face logo on it, and a beanie that may have had a ball on it (although Santos was not certain); and the March 5 Facebook photograph showed D.N. wearing a jacket without a North Face logo. Questions about the consistency of Santos's testimony go to its weight, not its admissibility, and resolution of such issues was for the trier of fact.

### III. DISPOSITION

The judgment is affirmed.

_____
Becton, J.*


I concur:


_____
Margulies, Acting P.J.


* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**DONDERO, J.,** Concurring.

I agree the substantial evidence test compels affirmance of the judgment here. "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* [(1980)] 26 Cal.3d [557,] 578, italics added; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 315–319.) The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' (*People v. Johnson*, *supra*, at p. 577.)" (*People v. Cuevas* (1995) 12 Cal.4th 252, 260–261 (*Cuevas*), overruling *People v. Gould* (1960) 54 Cal.2d 621 (*Gould*).) At oral argument, minor's counsel argued he was deprived of adequate review on appeal because the juvenile court gave no reasons to guide our review. I write separately because, in this eyewitness identification case, I agree the absence of any statement by the court explaining why it found the allegations of the petition true hamstrings this court's ability to conduct a review of the evidence for substantiality.

Here, the trial court simply stated: "I have heard the evidence in this case and numerous witnesses over the course of including today, seven afternoons. And having evaluated the evidence that was admitted and the credibility of the witnesses, I do find that the . . . allegations of the petition have been proven beyond a reasonable doubt . . . ." The evidence included a jerky, grainy video of people getting on and off the Muni train R.B. was riding when his cell phone was snatched; the testimony of one police officer who claimed to recognize the minor in the video, based on having seen him in the neighborhood and in Facebook pictures prior to the phone snatch; the testimony of another police officer who initially recognized a different juvenile in the video; and the testimony of three persons with no connection to the minor: a store clerk who recognized him as a customer, a San Francisco State University student who was on the train, and a

1

member of a nearby church who tried to stop the fight.  The latter two had never seen the minor; all three swore the person who tussled with R.B. on the street over the phone was a girl, and not the minor.  Additionally, on May 8, 2013, R.B. was twice shown a photographic lineup of six similar-looking African-American teenage boys (including the minor) with the photos in a different order each time.  Both times he identified a juvenile who was not the minor as the thief, stating he was 75 percent positive about his choice.[1]  On May 16, 2013, R.B. testified the minor was the thief, identifying him with 75 percent confidence.  After transmittal of the exhibits to this court at our request, the appellate record contains numerous photos of the minor, as well as the video.  It is fair to say this chameleon-like youth looks different in almost every picture, and could be the person depicted in the Muni video.

Until *Cuevas, supra*, 12 Cal.4th 252, overruled it, the long-standing rule in this state was that an out-of-court identification is insufficient to support a criminal conviction or juvenile adjudication in the absence of other corroborating evidence linking the suspect to the crime.  (*Gould, supra*, 54 Cal.2d 621, 631; *In re Johnny G.* (1979) 25 Cal.3d 543, 547.)[2]  That rule could not have helped the minor here, however, since R.B. *did* identify the minor in court.  Quoting *Gould, supra*, the *Cuevas* court ironically observed:  " '[T]he [out-of-court] identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind.  [Citations.]  The failure of the witness to repeat the [out-of-court] identification in court does not destroy its probative value . . . .'  [Citations.]  It is paradoxical, as other courts

_____

[1] The photographic lineup was conducted by a San Francisco police officer.

[2] In *In re Johnny G., supra*, 25 Cal.3d 543, our Supreme Court held the evidence insufficient to sustain the order under *Gould*.  (*Id*. at p. 548.)  Although the *Cuevas* court disapproved four cases that relied on *Gould*, it did not disapprove *Johnny G.*  (*Cuevas, supra*, 12 Cal.4th at p. 275, fn. 5.)

2

have recognized, to acknowledge that an out-of-court identification has greater probative value than an in-court identification, and yet hold that an in-court identification is sufficient evidence on which to base a conviction but an out-of-court identification is not. [Citations.]" (*Cuevas, supra*, 12 Cal.4th at p. 265.)

All the more reason why the court sitting as trier of fact in a juvenile case should state reasons for its decision when guilt rests on an in-court eyewitness identification and the record contains ample basis for questioning it.[3]  A minor facing felony charges in juvenile court has a state constitutional right to meaningful appellate review based on an adequate record of the proceedings.  (*In re Steven B.* (1979) 25 Cal.3d 1, 7–8; *People v. Moore* (1988) 201 Cal.App.3d 51, 57.)  I recognize that right does not include a statement of reasons, although I note such a right is accorded in many other contexts where the consequences of the decision are equal to or less serious than the consequences attending a juvenile adjudication of guilt.  (See, e.g., *In re Sturm* (1974) 11 Cal.3d 258, 272–273 (*Sturm*) [parole board must provide statement of reasons for denying parole]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [same]; *Morrissey v. Brewer* (1972) 408 U.S. 471, 489 (*Morrissey*) [due process requires statement by factfinder as to evidence relied on and reasons for revoking parole]; *Gagnon v. Scarpelli* (1973) 411 U.S. 778, 786–791 [extending *Morrissey* to probation revocation]; *Vitek v. Jones* (1980) 445 U.S. 480, 487–491 [due process requires statement of reasons for transfer of prisoner to mental hospital

---

[3] The majority opinion correctly observes D.N.'s brief does not allege the use of an unduly suggestive and unnecessary identification procedure.  However, prior to trial, defense counsel asked that D.N. be excused from the courtroom while she cross-examined R.B. about his identification, arguing:  "Because it's too easy.  He's going to be sitting there and he's going to give a description.  He's just going to be looking at the minor and that is more suggestive than a cold show lineup.  There cannot be anything more suggestive than one person sitting at a defense chair being accused of the charges . . . .  [T]he victim whose [*sic*] never identified [D.N.] is going to be identifying for the first time while looking at him.  [¶] So, it's just not—it really does violate due process.  It's not a fair identification, Your Honor."  The court denied the request.

for treatment]; Code Civ. Proc., §§ 128.5, 177.5 [requiring statement of reasons justifying imposition of expenses]; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 654 [due process requires statement of reasons for awarding sanctions]; Pen. Code, § 1170, subd. (c) [court must state reasons for sentence choice]; *In re Pipinos* (1982) 33 Cal.3d 189, 198–199 [court must state reasons for denying bail]; *Kent v. United States* (1966) 383 U.S. 541, 557 (*Kent*) [where court makes determination of fitness for juvenile court treatment, due process requires statement of reasons].)

When it extended the protections of the due process clause to delinquency adjudications in juvenile court, the United States Supreme Court stated: "[T]he Juvenile Court Judge's exercise of the power of the state as *parens patriae* [is] not unlimited. . . . '[T]he admonition to function in a "parental" relationship is not an invitation to procedural arbitrariness.' . . . '[T]here is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, *without a statement of reasons.*' " (*In re Gault* (1967) 387 U.S. 1, 30, original emphasis omitted, italics added, quoting *Kent, supra*, 383 U.S. at pp. 554–555.) Our Supreme Court has recognized that, "*Kent* stands for the proposition that fairness requires *a statement of reasons* as a guard against the arbitrary exercise of certain kinds of informal power." (*Sturm, supra*, 11 Cal.3d 258, 269, fn. 13, italics added.)

In some situations, a statement of reasons is indispensible to meaningful judicial review. This is one such situation. "Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions." (*Kent, supra*, 383 U.S. at p. 561.) Without some indication from the juvenile court about which witnesses it found credible, which it found incredible, and why, it is difficult—if not impossible—to "follow 'the analytic route the [juvenile court] traveled from evidence to action' [citation] . . . ." (*Juan T. v. Superior Court* (1975) 49 Cal.App.3d 207, 209, fn. 2.) Applying the

4

substantial evidence rule here, I must " 'assume' that there are adequate reasons" and guess at what they are.  (*Kent, supra*, 383 U.S. at p. 561.)  Here, more would be better.

_____
Dondero, J.

5