Filed 9/9/22 P. v. Ramos CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077192 |
| v. | (Super.Ct.No. FSB19002460) |
| FELIPE MANUEL RAMOS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Steve Malone, Judge. Affirmed as modified.

Pauline E. Villanueva, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Felipe Ramos, participated in the beating of another inmate while incarcerated in San Bernardino County Jail. Following a jury trial, he was convicted of violating Penal Code section 245, subdivision (a)(4),[1] assault by force likely to produce great bodily injury, and the jury returned a true finding that he personally inflicted great bodily injury pursuant to section 12022.7, subdivision (a). He was sentenced to an aggregate term of 5 years for the substantive offense and enhancement allegation. In addition, he was granted conduct credits in the amount of 1364 days, representing 682 days actually served in local custody, plus 682 days conduct credit. Defendant appealed.

On appeal, defendant argues the trial court (a) erroneously permitted a prosecution witness to narrate what he saw on a surveillance video of the assault, and (b) erred in refusing to strike the great bodily injury enhancement for purposes of sentencing. We have also identified an error in the calculation of the sentencing credits.[2]

## BACKGROUND

At Glen Helen Rehabilitation Center, there are two dormitories on B Block, with 60 inmates housed on each side. Connecting the two dormitories is a sally port, used to

---

[1] All further statutory references are to the Penal code, unless otherwise indicated.

[2] Because the credits awarded by the trial court are unauthorized by section 2933.1, it may be corrected at any time. (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391 ["a legally unauthorized sentence subject to correction for the first time on appeal"].)

2

communicate with inmates on both sides of B Block. The sally port also provides access to the bathroom area and the day room. In B Block, there are various cameras in the dormitories as well as in the day room, with two cameras pointed into the dormitory. There is also a housing unit office where deputies watch those cameras.

The deputies' routines also involve doing hourly walks to make sure the inmates are safe. Deputies have additional day-to-day contact with inmates when the inmates come up to ask questions. In performing these tasks, deputies become familiar with the names and faces of the inmates. The sally port area is regularly used to communicate with inmates on both sides of B Block, and it is the area where deputies can pass medications to the inmates, and where the inmates can access the bathroom area and dayroom.

On July 13, 2019, at approximately 8:30 p.m., deputies at Glen Helen were just finishing the inmate count in the C Block of the Housing Unit. In performing an inmate count, deputies go to each inmate, have the inmate say his name and hold up his identification, so the deputies can verify that the person holding the identification is the right inmate. Deputy Navarro's experience in the daily count, as well as his other day-to-day contacts with inmates, has enabled him to become familiar with the inmates, including learning their names and mannerisms. By the date of this incident, he was familiar with most of the inmates.

At some point after 8:00 p.m., a commotion was heard over the radio and deputies were informed of a fight in Dorm 2. Deputies responded to the sally port (East Twilight)

3

area where Deputies Brown and Navarro saw an inmate, named Osorio, who had just been involved in a fight. Deputy Navarro recalled seeing Osario standing over another inmate, assaulting him, on the camera before reporting to the B Block sally port, where he ordered the inmates to stop fighting. Navarro was able to recognize Osario as the person kicking the inmate who was on the ground and ordered Osorio into the sally port so he could be removed from the dormitory and then handcuffed.

After Osorio was removed, Deputy Brown went to West Twilight[3] where the victim of the assault, Robert Johnson, was located. Johnson was escorted to a holding cell pending arrival of an ambulance. Johnson had bloodied hands, arms, and pants, and he sustained large cuts across his back; the lacerations went from his shoulder to his lower back. There were also bruises on Johnson's neck area, and cuts and bruises on his hands. However, Johnson was uncooperative, refusing to name his assailants. Johnson was transported to Arrowhead Regional Medical Center for treatment. Among cuts and bruises, he suffered a nasal bone fracture.

After the incident, the inmates were ordered to report to their bunks. At that point, surveillance videos were obtained and reviewed in order to investigate the incident. While watching the video marked as Exhibit 2, Navarro was able to recognize most of the inmates who were involved in the assault on Johnson. At trial, the video was played during his testimony and he was able to describe what he saw: at first, he noted there

---

[3] The terms "West Twilight" and "East Twilight" were not explained in the testimony, but from the context in which the terms were used, they appear to refer to sally port accesses to the dormitories, which are opposite from each other.

were inmates surrounding one bunk, and one inmate was seen handing an object to another inmate. The next part of the video showed some inmates, identified as Osorio, Perez, and Gonzalez, who appeared to be assaulting another inmate. Then, he pointed out an inmate who had been sitting on top of a bunk, dressed in an orange. He identified this inmate as defendant, although the bunk he was sitting on was not assigned to defendant.[4]

On the video, Navarro described seeing defendant, dressed in the orange outfit with a white tee-shirt sticking out from the shirt, get off the bunk and walk into the aisle, pulling up his pants as he did so. Then he pointed out defendant on the video, walking up behind another inmate and "stopping"[5] where Johnson was located, pulling up his pants again. Fast forwarding the video showed defendant walking back to the bunk area, pulling up his pants yet again.

Video from the other camera was also played for the jury during Navarro's testimony. This video, from another angle, showed defendant on the bunk with the fight ongoing, getting off the bunk, and pulling up his pants.[6] Navarro described defendant

---

[4] It is apparently common for inmates to switch bunks without informing the deputies, where they may feel more comfortable sleeping with others of the same race or ethnicity.

[5] The reporter's transcript reflects the witness as stating, "It appears he is stopping where the victim is located." But both parties base their respective arguments on the assumption the officer actually said defendant could be seen "stomping" where the victim is located.

[6] Much of Navarro's testimony regarding the events captured from Camera No. 1, is unclear due to vague questions. For example, the prosecutor asked the witness, "Okay I'm going to point my mouse. Do you recognize that person there? This one here (indicating) Can you tell us . . . ?" ANSWER: "Yes." A few questions later, the prosecutor asked, "Now, do you see Mr. Ramos now at 336? Let me play the rest here.

*[footnote continued on next page]*

standing in front of a bed, while the victim was also visible on the screen, as was Osorio.[7]

Then defendant was seen walking towards the bathroom at about the time Navarro reached the sally port location where he ordered Osorio to come over to that area. At that point, defendant re-entered the dormitory.

In order to make sense of the testimony and imprecise description of the events recorded on the video, we watched it ourselves. The video shows the interior of the dorm with three columns of bunks separated by two aisles; the rows of bunks comprise a single bunk against each wall of the dorm, with two bunks end-to-end in the center of the row. The video camera shows the dorm with the rows of bunks laid out diagonally, from lower right to upper left of the screen. At the beginning, the person identified as the defendant is seen sitting on a bunk, which is the third row up from the rear wall of the room. At approximately 0:16 into the video, an inmate enters the area between the bunk on which defendant is sitting and the bunk four rows up from the rear of the room. This inmate, identified as Castillo, bends in, appearing to hand something or say something to the

_____

Right there. Do you see him now?" Perhaps a description of what defendant or other persons were doing would elucidate the import of the image. It would have been easier to follow if the witness had been allowed to testify about what he had seen, rather than have the prosecutor ask, "Do you see Mr. Ramos in the picture at this point?" After all, the witness was called to testify about what he saw transpire on the video. On this record, Navarro never testified that he saw the defendant stomping on Johnson during the assault he watched on videotape.

[7] The reporter's transcript identifies the person as "Rosario" on page 132, but the same person is referred to as Osorio on the next page. We assume this is a typographical error.

6

inmate in the lower bunk. At this point, the inmate in the lower bunk next to where Ramos was sitting got up, and Ramos sat upright.

Then, several inmates converge on a lower bunk near where Castillo was located. There is a scuffle involving approximately three inmates against one. The scuffle moves to the aisle that runs along the left side of the screen, where other inmates jump on the victim, as defendant watched. Eventually, Ramos got off the bunk, hiked up his pants, and walked in the direction of the assault.[8] Defendant reached the melee in the aisle as it moved towards the upper left corner of the screen and worked his way into the group. From there, Ramos can be seen applying force downward towards the victim with his foot in a stomping or stamping motion.

## DISCUSSION

1. ***There was no error in allowing the prosecution witness to describe what he saw on the video***.

Defendant argues that the trial court committed error in permitting Navarro to narrate the events depicted on the surveillance video. He asserts that in his testimony, Navarro identified defendant as being one of the people involved in the incident and testified that defendant "stomped" on the victim.[9] This, he argues, constitutes improper

---

[8] We do not use the term "fight" because Johnson did not strike any blows during the assault.

[9] The reporter's transcript mis-transcribed Navarro's testimony, reflecting the following:
Q    Can you use the laser pointer and point out where that person is?
A    (Indicating).

*[footnote continued on next page]*

lay opinion testimony, which should have been excluded. We disagree. The People argue defendant forfeited the objection, but the record reveals the issue was preserved.

We begin with the standard of review. "We review the trial court's decision to admit or exclude evidence for abuse of discretion." (*People v. Dworak* (2021) 11 Cal.5th 881, 895.) In doing so, we examine the ruling of the trial court and ask whether it exceeds the bounds of reason or is arbitrary, whimsical or capricious. (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018, citing *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478.) "This standard involves abundant deference to the trial court's rulings." (*People v. Jackson, supra,* at p. 1018.)

"It is now clearly established that lay opinion testimony concerning the identity of a [perpetrator] portrayed in a surveillance camera photo of a [crime as it was being committed] is admissible where the witness has personal knowledge of the defendant's appearance at or before the time the photo was taken and his testimony aids the trier of fact in determining the crucial identity issue." (*People v. Ingle* (1986) 178 Cal.App.3d 505, 513.) "The identification testimony of the witness viewing the film of the [crime] may be considered lay opinion on the question of the identity of the person depicted

---

Q.     Okay. I'll stop right there, 143. What did you notice that person doing? It appears that - -
MR . DUNCAN: I will make my objection .
THE COURT: All right. Your previous objection is made at this time and is overruled.
THE WITNESS: It appears he is *stopping* where the victim would be located." (Italics added.)
This is apparently an error, given the nature of the arguments in the Evidence Code section 402 hearing and given that the People have not corrected defendant's characterization. Having viewed the video, defendant did not "stop" when he joined the group of assailants.

8

therein inasmuch as the witness was not qualified as an expert in film reading or interpretation." (*People v. Perry* (1976) 60 Cal.App.3d 608, 612. 629.) In *Perry,* the police officer witness was permitted to offer lay opinion identifying the defendant as the perpetrator of a robbery from a surveillance video, based on his familiarity with defendant's abnormal eye. The reviewing court ruled the testimony of the officer was admissible as lay opinion based on what the witness observed on the film, and also rejected the defendant's argument that the testimony invaded the province of the jury. (*Perry, supra,* 60 Cal.App.3d at pp. 612-613, 613-614.)

Since the opinion in *Perry*, court of appeal decisions have upheld admission of testimony identifying defendants in surveillance footage or photographs. (*People v. Leon* (2015) 61 Cal.4th 569, 601; *People v. Mixon* (1982) 129 Cal.App.3d 118, 130-131.) The witness's degree of knowledge of the subject by the identifier is a matter of weight, not admissibility. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067.)

The trial court did not abuse its discretion in permitting deputy Navarro to describe what he saw when he observed the surveillance video.

2.     *The court did not abuse its discretion in declining to strike the enhancement pursuant to section 12022.7, subdivision (a).*

Defendant argues the trial court abused its discretion in refusing to strike the great bodily injury enhancement imposed pursuant to the jury's true finding under section 12022.7, subdivision (a). We disagree.

9

Section 1385, subdivision (a), provides "The judge . . . may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record." Subdivision (c) of section 1385 establishes that a court also has discretion to dismiss or strike an enhancement, or to "'strike the additional punishment for that enhancement in the furtherance of justice.'" (*People v. Meloney* (2003) 30 Cal.4th 1145, 1155.) Such a determination "'"requires consideration both of the constitutional rights of the defendant, and the *interests of society represented by the People* . . . [Citations.]" [Citations.]'" (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 530 (*Romero*).)

In addition to acting on its own motion or at the instance of the prosecutor, a defendant has the right to "'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).)

"'[A] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion." (*Carmony, supra*, 33 Cal.4th at p. 373, citing *Romero, supra*, 13 Cal.4th at p. 531.) A trial court's decision to not strike an allegation will be upheld unless the decision is irrational or arbitrary. (*Carmony, supra*, at pp. 376-377.)

10

Defendant requested that the court exercise its discretion because defendant's culpability was mitigated, insofar as defendant's involvement in the assault on the victim was attributed to mob mentality. Defendant also argued that his record was not extensive and did not involve crimes of violence. The trial court indicated it was aware of its discretion and was familiar with defendant's criminal history as well as the matters set out in the sentencing memorandum. However, the court could not find that striking the enhancement would serve the interests of justice, a finding it was required to make on the record.

The concept underly the language permitting dismissal of an allegation "in furtherance of justice" or "in the interest of justice" requires consideration both of the constitutional rights of the defendant, and the interests of society represented by the People, in determining whether there should be a dismissal. (*Romero*, *supra*, 13 Cal.4th at pp. 530-531.) Here, defendant has relied on the notion that he acted with "mob mentality" but the probation report notes that he was housed in a unit where gang members are usually assigned. This casts the idea of "mob mentality" in a more sinister light, and supports the trial court's statement that it was actually an aggravating factor. Striking the enhancement because defendant acted with the mob does not serve the interests of society.

No other reasons were advanced by defendant in support of striking the enhancement and we see none. The trial court properly exercised its discretion in

declining to strike the great bodily injury enhancement pursuant to section 12022.7, subdivision (a).

*3.* **The clerk's minutes of sentencing must be corrected to conform to the oral pronouncement of judgment.**

At sentencing, the trial court committed defendant to state prison for the low term of 2 years on count one, assault by means of force likely to produce great bodily injury, along with a three-year enhancement for personal infliction of great bodily injury. In awarding credit for time served, the court noted that the conviction for violating section 245, subdivision (a)(4), when accompanied by an enhancement for great bodily injury pursuant to section 12022.7, subdivision (a), limits the amount of conduct credits that may be awarded by virtue of section 2933.1. The court therefore awarded defendant 682 days for time actually served in presentence custody, plus 102 days conduct credit.

The clerk's minutes and the abstract of judgment, however, reflect an award of 682 days conduct credit pursuant to section 2933.1, in addition to the days actually served, for total credit for time served of 1364 days. Even after a corrected minute order was prepared and filed, the total credits reflect the unauthorized award of 682 days of conduct credit despite the notation of the application of section 2933.1. The abstract of judgment also contains the erroneous credits calculation.

As the trial court properly noted, section 2933.1, subdivision (c), provides a limitation on the accrual of conduct credits: "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement

12

in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." (§ 2933.1, subd. (c).)

The proper calculation of the conduct credit is 102 days, the amount ordered by the trial court in the oral pronouncement of judgment. The number of days credited must be "the greatest whole number of days which does not 'exceed 15[.00] percent of the actual period of confinement. . . .' (§ 2933.1, subd. (c).)" (*People v. Ramos* (1996) 50 Cal.App.4th 810, 816.) Fifteen percent of 682 days is 102 days under the *Ramos* calculation. The credits reflected on the minute orders and abstract of judgment are in error and unauthorized.

The clerk's minutes and abstract of judgment awarding 682 days of conduct credit is unauthorized and does not reflect the actual credits awarded by the sentencing court. Where there is a discrepancy between the oral pronouncement of judgment and the minute order, the oral pronouncement controls, and we may correct this clerical error on appeal. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186)

The superior court is directed to amend the minutes and the abstract of judgment to conform to the oral pronouncement of judgment. We further direct the trial court to transmit the corrected minute order and abstract to the Department of Corrections and Rehabilitation.

## DISPOSITION

13

We direct the trial court to modify the sentence credits to reflect 682 days actually served, plus 102 days conduct credit pursuant to section 2933.1, for a total award of credit of 784 days of presentence credit, in conformity with the oral pronouncement of judgment. Upon correction, the clerk of the court shall transmit the modified minute order and abstract of judgment to the Department of Corrections and Rehabilitation. Except as so modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

SLOUGH
J.