Filed 8/12/16  P. v. Wade CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY ELI WADE et al.,<br><br>        Defendants and Appellants. | C076949<br><br>(Super. Ct. Nos. 13F00198, 12F00479, 13F00308) |

In this gang-related robbery case, defendants Anthony Eli Wade (Anthony) and Daniel Hernandez Wade (Daniel) timely appeal, raising several issues, none of which we find meritorious.[1]  Accordingly, we shall affirm the judgments.

---

[1]  Because defendants share a surname, we refer to each by his first name.  Juan Luis Jaramillo was also charged in this case, and held to answer after the preliminary hearing. However, the record shows Jaramillo resolved his case before trial.

1

## PROCEDURAL BACKGROUND

The jury found each defendant guilty of robbery (Pen. Code, § 211),[2] and active participation in a criminal street gang (§ 186.22, subd. (a)). The jury further found the robbery was committed in furtherance of gang activities. (§ 188.22, subd. (b)(1).) Anthony then admitted a prior serious felony allegation (§ 667, subd. (a)) and a strike allegation (§§ 667, subds. (b)-(i); 1170.12), both based on the same prior residential burglary (§ 459) conviction in 2012.

The trial court sentenced Anthony to 22 years four months in state prison, and sentenced Daniel to 13 years in state prison, and each defendant timely appealed.

## FACTUAL BACKGROUND

The robbery count was based on an incident occurring on October 20, 2012, in which Robert Edward Lee McMillian IV (McMillian) was attacked by a group of men near some dumpsters behind a shopping center on Stockton Boulevard. The gang-participation count was based on an incident on November 6, 2012, when a victim, who was never identified, was robbed nearby.

*McMillian Robbery*

McMillian testified he had been homeless and collected recycling to get money. He went to the dumpsters at the Lemon Hill shopping center two or three times a week. On the day of the robbery he was tired and "under the influence of probably some marijuana" as well as methamphetamine and heroin he had used several hours earlier, a daily occurrence for him at that time. He observed people playing music and smoking marijuana, so he decided to leave. He then heard a "whistling sound come past my ear" and saw a piece of metal bounce off some nearby cement. He turned around and heard some people laughing. He was then "overwhelmed" and beaten unconscious, waking to

---

[2] Further undesignated statutory references are to the Penal Code.

find that he had lost a lighter and $38. McMillian had three prior convictions evidencing moral turpitude: felony assault, felony theft, and misdemeanor burglary.

A witness driving on Stockton Boulevard near the shopping center saw a man being chased by five or six individuals, who began hitting and kicking the man, and then fled when they saw the witness approach. The victim was bleeding and the witness called 911. The attackers drove off in a white Buick and a red Mitsubishi.

Officer Jeffrey Dahl responded to the scene at about 4:15 that morning. McMillian was crying and in pain, but the officer did not note or recall that he claimed any property had been taken from him. Another officer retrieved surveillance video from the area, which showed the beating and the assailants going through McMillian's pockets. As detailed later, a gang expert testified he could identify defendants from various video clips.

On a different video clip found on Jaramillo's iPhone, a metallic sound is heard (evidently the item that McMillian described striking concrete) and then the attackers say "Grab him" and "Bitch, it's Norte" and "Go through his pocket." They demand money and repeatedly refer to "Norte." One man says "Ah, I think Stinky got stacks" and one says "I got a lighter." "Stinky" referred to a transient and "stacks" referred to money.

While Anthony was being held in police custody, he was recorded saying "Someone said Norte on the video. Dumb ass nigga. Whoever said that should get punched." This recording was played for the jury.

A number of variable-quality surveillance clips were shown to the jury that depict the prelude, the attack, and its aftermath, taken from 12 cameras located in various parts of the shopping center. Exhibit 5, clip no. 8 shows McMillian walking along a covered walk, with a parked white car in the background. About a minute later, men run toward the car and it leaves quickly, with one door hanging open. Exhibit 5, clip no. 7 shows five men by a darker parked car rush off-screen, with the driver holding an illuminated cell phone, and a bushy-haired man throwing something. Exhibit 4, clip no. 2 shows

3

McMillian run and fall and several men (eventually five) chasing and then beating and kicking him and going through his pockets; one of the men is recording the incident. At one point, a man faces the camera and appears to throw something away; he is wearing a hat and glasses. Another man, farthest in the background, has long bushy hair. Another camera shows the men running across the screen, at first perpendicular to a car that has pulled in, and the man with the hat as well as the man with the bushy hair can be seen. About thirty seconds later, this clip shows two cars leaving, one white and the other apparently dark red. Another view shows a person wearing glasses recording events and he and other men running off camera. It then shows the men returning, and the man wearing glasses with the cell phone running directly towards the camera. Although the image is not crystalline, his face can be seen.

Further evidence about these surveillance images will be described, *post*.

*Bus Stop Incident*

A witness was in a car at the corner of Fruitridge Road and Stockton Boulevard when he saw a man jump out of a maroon or burgundy car and run to a bus stop, where several people waited. The man snatched something out of the hand of one of those people. The witness testified he did not know "if he actually got it or not, but he walked away." Then he laughed, got back in the car, and left (as a passenger in the car). The witness called 911. The attacker was white, with bushy long hair, no older than 30. The witness could not describe the driver at trial, but in a 911 call described the driver as a black male. The car the witness was in followed the attacker's car, made another 911 call, and eventually followed the car to a trailer park. Later, the police took the witness to the trailer park, and he identified the person as best he could.

A police helicopter followed a maroon Oldsmobile toward the trailer park and assisted in apprehending the car's occupants. Anthony was in the passenger seat and Daniel was the driver. A mobile telephone belonging to Daniel was recovered from the front passenger seat. Jaramillo was also in the car, and he had an iPhone. The video clip

4

of the McMillian beating was found on Jaramillo's iPhone. Two other people were in the car, Frank Wood and Felip Sierra. At the scene, the witness identified Anthony as the robber.

*Gang and Video/Photographic Identification Evidence*

Detective Don Schumacher, an experienced gang officer, testified about 3,000 Norteño gang members operated in the greater Sacramento area. Their primary activities include assault, robbery, and homicide, and members have to "put[] in work" for the gang. Based on various factors, he opined that both defendants were active Norteño gang members. One image taken from Daniel's phone depicted both defendants, along with Sierra, fashioning (with their arms) the roman numeral XIV (14) indicating the Norteño gang. Other photographs showed both defendants in gang-related poses or with gang images. Schumacher opined that Jaramillo, Sierra, and Wood were also active Norteño gang members.

Schumacher testified that he believed defendants were two of the men depicted in the McMillian robbery surveillance images. At trial, he testified Jaramillo's cell phone contained a video date-stamped October 20, 2012, depicting someone getting beaten and robbed in a parking lot. There was also a photograph, Exhibit 25, showing both defendants spraying graffiti. He was aware of Daniel's appearance from photographs, seeing him in gang clothing, and speaking to him in person. He had seen photographs of Anthony and his gang tattoos and clothing, and had seen him in person and in photographs with Daniel. He identified one person in the graffiti photograph "on first glance" as Daniel, and the other as Anthony based on "[m]y recent contacts with him and just the long hair, the body style, the fact that they are cousins. They are contacted together on a regular basis. That was my hunch."

Per Schumacher, the cell phone video of the assault depicted one person with an "H" and an "A" tattoo on his hand, which were very similar to the tattoos that Anthony Wade had. Daniel could be seen in some of the surveillance videos, based on "his

5

physical characteristics, the hair color, the sunglasses, the body type, the height and weight" as well as his red shorts, particularly while he was recording with the cell phone camera. Anthony, too, could be seen, "[p]rimarily [in] the cell phone video with the tattoos" and in the surveillance video "[h]is hair was a big determinant to me. You can see the longer hair he had, the skin tone, height[,] weight, all the physical descriptors that were very similar to him."

## DISCUSSION

### I

*Daniel: Gang Expert's Lay Opinion Testimony*

Both defendants moved in limine to preclude testimony that they had been identified from certain surveillance images. On appeal, Daniel challenges the trial court's ruling allowing this testimony.[3] Before addressing his claims, we set out more details of the procedures before trial.

At a pretrial hearing (Evid. Code, § 402), Detective Schumacher testified he investigated a robbery committed in 2012 on Stockton Boulevard. He reviewed surveillance video from security cameras, as well as images from Jaramillo's cell phone. He recognized both defendants, with each of whom he had had prior contact and whose photographs he had seen on Facebook. He also found images on Daniel's cell phone of both defendants that helped identify them. As for Daniel, he based his identification on "facial features, height, weight, glasses, [and] hair." His identification of Daniel on the images from Jaramillo's phone "was not as strong as on" Anthony, but in particular Daniel's hand markings (a black X) and the fact Daniel was an associate of Anthony

---

[3] Anthony provides no briefing on this issue, though he purports to join Daniel's arguments that benefit him. The factual matrix of this issue differs as to each defendant, therefore we agree with the People that Anthony has not properly joined in it. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.) Anthony does not quarrel with this view in his reply brief.

6

satisfied Schumacher that Daniel, too, was depicted in that video, as well as on some of the store's surveillance video clips. He testified: "The image of the person on the surveillance video is an identical match to what Daniel Wade looks like." As for Anthony, the cell phone video shows "the letters H and A on one of the hands" which matches a tattoo of "Hated" on one of Anthony's hands; that plus Anthony's "dark wavy hair" is shown.

Defense counsel argued, in essence, that absent evidence either defendant had changed his appearance, Schumacher's identification would transgress the jury's prerogative to determine who was shown by the videos. The videos were unclear and the jury would see the defendants in the courtroom for several days, therefore Schumacher's proposed testimony that defendants were depicted, based on a weaker foundation of seeing them in person than the jury would have during the trial, was improper. During colloquy, all parties agreed that no eyewitness could identify the robbers.

Before making its ruling, the trial court discussed legal authorities on the subject, and reviewed the circumstances of each video, as well as a still photograph purportedly showing the defendants spraying graffiti (tagging), and the parties argued the point further. The People evidently dropped their intention to rely on any identification based on an "X" on Daniel's hands. Ultimately, the trial court ruled Schumacher had an adequate foundation to identify the defendants, his testimony would assist the jury, and it would not usurp the province of the jury to find facts. The trial court emphasized that the jurors would view the defendants in court and on the various recordings and would be "free to accept or reject the detective's opinion just as they are free to accept or reject anybody's opinion."

At trial, Schumacher's testimony was more limited than originally contemplated. As relevant to Daniel, Schumacher testified Daniel was depicted in some of the surveillance clips, based on his appearance and his clothing. "And based on my prior contacts with him, looking at several or a myriad of different pictures of him, I was fairly

7

confident that was the same person holding the phone as was in the surveillance video." Schumacher was not cross-examined on this point.

On appeal, Daniel contends the trial court abused its discretion by allowing Detective Schumacher to give his lay opinion that Daniel was depicted in the surveillance videos at the shopping center. We disagree.

In *People v. Perry* (1976) 60 Cal.App.3d 608 (*Perry*), we addressed when a non-percipient witness may testify to an identification based on a recorded image. A movie camera recorded a robbery. A peace officer recognized Perry from the film "based upon past recollection of [Perry's] appearance from numerous street contacts during the preceding five-year period and the fact that [Perry] had an abnormal-appearing eye." (*Id.* at p. 610.) At trial, Perry unsuccessfully objected to this testimony, as well as testimony by Perry's parole officer, who identified the person on the film as Perry "on the basis of general facial features, his height and the abnormal right eye." (*Id.* at pp. 611-612.) We began our analysis of the issue as follows:

> "The identification testimony of the witness viewing the film of the robbery may be considered lay opinion on the question of the identity of the person depicted therein inasmuch as the witness was not qualified as an expert in film reading or interpretation. Evidence Code section 800 prescribes the limits within which lay opinion testimony may be used. 'If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:
>
> " '(a) Rationally based on the perception of the witness; and
>
> " '(b) Helpful to a clear understanding of his testimony.'
>
> "Defendant concedes that the identity of a person is a proper subject of nonexpert opinion [citations], but argues that only a percipient witness to the crime may give testimony on the question of identity. We do not perceive the rule so restrictively." (*Perry*, *supra*, 60 Cal.App.3d at p. 612.)

We pointed out that "[t]he witnesses each predicated their identification opinion upon their prior contacts with [Perry], their awareness of his physical characteristics on the day of the robbery, and their perception of the film taken of the events. Evidence was

8

introduced that [Perry], prior to trial, altered his appearance by shaving his mustache. The witnesses were able to apply their knowledge of his prior appearance to the subject in the film. Such perception and knowledge was not available directly to the jury. The opinions of the witnesses were sufficiently based upon personal knowledge to permit their introduction; the question of the degree of knowledge goes to the weight rather than to the admissibility of the opinion." (*Perry*, *supra*, 60 Cal.App.3d at p. 613.)

To the objection that the evidence invaded the province of the jury, we analogized to statutes permitting lay opinion evidence regarding handwriting identification (Evid. Code, §§ 1416, 1417), where the witness has a sufficient foundation to know the author's handwriting (*Perry*, *supra*, 60 Cal.App.3d at pp. 613-614). We concluded this did not invade the province of the jury because "[l]ay opinion testimony is submitted to the trier of fact only as an aid in arriving at the ultimate decision," and we held the same was true of identification testimony. (*Id*. at pp. 614-615.)

In *People v. Mixon* (1982) 129 Cal.App.3d 118, a camera was tripped when money was taken from a certain part of a cashier's till. (*Id*. at pp. 124-125.) Two peace officers testified that one of the robbers depicted on one of the photographs was Mixon. (*Id*. at p. 125.) On appeal, Mixon claimed both that there was no adequate foundation for such testimony, and that it invaded the province of the jury. (*Id*. at p. 127.) After discussing *Perry* and other authority, *Mixon* held: "*Perry* thus requires two predicates for the admissibility of lay opinion testimony as to the identity of persons depicted in surveillance photographs: (1) that the witness testify from personal knowledge of the defendant's appearance at or before the time the photo was taken; and (2) that the testimony aid the trier of fact in determining the crucial identity issue." (*Id*. at p. 128.) *Mixon* cautioned that peace officer identifications of a defendant may be prejudicial if they suggest the police have been watching the defendant, or that the defendant was the subject of frequent police contacts. (*Id*. at pp. 129, 132-135.)

9

In *People v. Ingle* (1986) 178 Cal.App.3d 505, before trial a robbery victim was first shown a videotape of the robbery and then a photo lineup, from which she selected Ingle as the robber. (*Id*. at p. 509.) The defense unsuccessfully argued the pretrial identification was tainted, and at trial the victim testified her identification of Ingle had not been influenced by watching the videotape. (*Id*. at pp. 509-510.) *Ingle* rejected the claim that the pretrial identification was tainted, and in part observed:

> "It is now clearly established that lay opinion testimony concerning the identity of a robber portrayed in a surveillance camera photo of a robbery is admissible where the witness has personal knowledge of the defendant's appearance at or before the time the photo was taken and his testimony aids the trier of fact in determining the crucial identity issue. [Citations.] *Where the photo is unclear*, or the defendant's appearance has changed between the time the crime occurred and the time of trial, *or where for any reason the surveillance photo is not conclusive on the identity issue, the opinion testimony of those persons having knowledge based upon their own perceptions* [citation] *of defendant's appearance at or before the time the crime occurred is admissible on the issue of identity, and such evidence does not usurp or improperly invade the province of the trier of fact*." (*People v. Ingle*, *supra*, 178 Cal.App.3d at p. 513, italics added.)

Most recently, our Supreme Court has held that a ruling allowing a peace officer to identify a person on a surveillance recording is reviewed for an abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569.) Citing *Perry*, *Mixon*, and *Ingle*, *Leon* upheld the use of such lay opinion testimony, provided that the witness had a sufficient basis of knowledge to make the identification. (*Id*. at pp. 600-601.)[4]

---

[4] Language in *Perry* and *Mixon* that can be read to suggest the witness must have had knowledge of the appearance of the person allegedly depicted either before or at the time the image was captured has been clarified; although that was the case, factually, in *Perry* and in *Mixon*, that is not always the case, nor is it a necessary condition for introduction of such evidence. (See *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1066-1067.) The critical question is whether the witness's opinion is sufficiently based upon personal knowledge--whenever acquired--to permit its introduction. Further, the fact some of the detective's knowledge consisted of other photographic images, rather than physical encounters, goes to the weight, not admissibility, of the evidence. (*Id*. at p. 1068 ["One can be sufficiently familiar with a person by seeing photos of him to later identify him in

10

Based on these authorities, the trial court acted well within its discretion in finding Schumacher had a sufficient basis for identifying Daniel, and that, due to the lack of clarity of the video images, his testimony would be of assistance to the jury.

Daniel interprets the record to indicate the trial court mistakenly believed the People had some "overarching right" to present identification evidence, but the record does not support this contention. The trial court did establish that there was no other evidence of identification, but did not state or imply that this gave the People the right to introduce Schumacher's testimony absent compliance with the normal rules regarding opinion testimony, as interpreted by case law.

Although Daniel suggests the testimony was not proper lay opinion testimony, but was actually a form of expert testimony, we do not agree that the holdings of *Perry*, *Mixon*, *Ingle*, and *Leon*, described above, support this view. Indeed, in his reply brief Daniel asserts, "The cases may speak of lay opinion, but what they actually describe is expert opinion." We disagree because the relevant cases, summarized in detail *ante*, speak for themselves, and address lay opinion identification testimony.

We agree with the People that to the extent Daniel argues the evidence was prejudicial (Evid. Code, § 352), his failure to interpose a prejudice objection in the trial court means he has not preserved the claim for appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 434-435.) Even in his reply brief, Daniel does not address the lack of a prejudice objection, therefore we deem the claim forfeited.[5]

---

the same or another medium. We do not doubt that a starstruck young lady who has seen pictures of Justin Bieber in magazines could easily identify him were she to see him on a video, on television or in person"].)

[5] When asked at oral argument, appellate counsel for Daniel suggested (without providing any specific citation to the record) that an appropriate objection was made during the in limine hearing. The Attorney General's representative disagreed. We have reviewed the record of the hearing and find no specific objection to the admission of the disputed evidence on Evidence Code section 352 grounds.

11

## II

### *Daniel: Substantial Evidence of Robbery*

Daniel contends no substantial evidence shows he participated in the McMillian robbery. We disagree. In part this claim is undermined by our conclusion that Schumacher's lay identification testimony was admissible.

Daniel contends the surveillance footage does not adequately prove he was at the scene. However, Exhibit 6, clip no. 11 (the third clip), shows the face of the participant who filmed the incident, the man with glasses, and although the video is grainy, it appears sufficient to enable a jury to make an identification, as did Schumacher. Other videos show the group as a whole running toward McMillian, knocking him to the ground, beating him, and going through his pockets. Daniel can be seen recording the event, right alongside his cohorts. From his actions the jury could find he was recording the crime for gang purposes, and thus was an aider.

## III

### *Both Defendants: Unanimity Instruction*

Defendants contend that some jurors could have found McMillian was robbed of $38 and some could find he was robbed of a lighter, and because the prosecutor declined to make an election, the trial court should have given the jury a unanimity instruction. We disagree that a unanimity instruction was appropriate.

A unanimity instruction ensures a unanimous verdict when the evidence raises the possibility that some jurors will find one crime was committed, while other jurors find a different crime occurred. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1199.) However, a "unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

12

The theft of the money and of the lighter occurred during the same incident, within seconds, as multiple people who had jointly beaten the victim into submission went through his pockets and announced what they had found, one saying referencing money ("Stinky got stacks") and another the lighter. This was not two robberies, nor could any jury rationally so find. Instead, it was the forcible taking of two different kinds of property from one victim on one occasion.

The defense was that defendants were not participants in the attack. Daniel's counsel argued that, even assuming Daniel was the person depicted on any of the recordings, he was merely photographing the event. There was no evidence he shared the perpetrators' intent to steal, only at the worst an intent to beat the victim; therefore he was not liable as an aider and abettor to robbery, but at worst was guilty of an assault. Anthony's counsel argued that, assuming the jury even found he was involved, the incident was an assault that possibly developed into a theft, but there was no evidence of an intent to steal at the time of the initial attack. Anthony's counsel also attacked McMillian's ability to perceive and recall that *anything* was taken, based on McMillian's admitted intoxication.

Under such circumstances, no unanimity instruction was required, because the jury would either accept or reject the respective defense theories as to both takings, and had no basis to distinguish between the two takings. (See *People v. Riel*, *supra*, 22 Cal.4th at pp. 1199-1200.) As stated by our Supreme Court, rejecting a somewhat similar claim: "The testimony supported the prosecutor's characterization of the event as 'two robberies actually occurring at the same time.' Defendant did not offer a defense based on a showing that he committed either the attempted robbery or the completed robbery, but not both. Rather, his defense was that he was not present at the scene of the crime and therefore played no role whatsoever in any of the crimes committed there. A unanimity instruction therefore was not required." (*People v. Williams* (2013) 56 Cal.4th 630, 682.)

13

Defendants emphasize discrepancies in the evidence about whether any money was taken and if so how much, and whether a lighter was actually taken. But those discrepancies do not change the fact that if any property was taken, it was all taken during one continuous course of criminal conduct.

IV

*Both Defendants: Substantial Evidence of Gang Participation*

Defendants contend no substantial evidence supports the gang participation count. We review the record in the light most favorable to the judgment. (See *People v. Abilez* (2007) 41 Cal.4th 472, 504.) We reject their claim.

This count was based on the bus stop incident. As recounted above, a passerby saw what appeared to be a snatch-and-grab robbery by Anthony, and followed the getaway car until the police had control over the perpetrators. Both defendants were in the car, with Jaramillo, Wood, and Sierra; Daniel drove. All five men were Norteños.

The incident was charged as active participation in a criminal street gang. Section 186.22, subdivision (a) provides as follows: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

The People must prove that "felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132.) The jury was so instructed. The jury was also told the felonious conduct alleged was robbery, and were referred to the robbery instructions given as to count 1.

14

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)

After lengthy boilerplate on substantial evidence and undisputed developments in the law regarding this statute, Anthony briefly asserts no substantial evidence shows he "promoted, furthered, or assisted in the preparation of felonious conduct by at least two gang members.  [Citations.]  Initially, felonious conduct was not even sufficiently proven.  Additionally, Anthony, who acted alone, did not violate section 186.22(a)."  Daniel elaborates on the claims.  First, Daniel correctly points out that a taking by force beyond that necessary to acquire the property must be shown to prove robbery (see *People v. Anderson* (2007) 152 Cal.App.4th 919, 946), and he contends there was no substantial evidence of violence or even any kind of struggle.  Second, Daniel contends there was no evidence Anthony took any property at all, or if he did momentarily acquire any property, that he took it with the intent to keep it, rather than simply to "mess with someone for some cheap laughs."  Third, Daniel joins in the claim that assuming Anthony robbed the victim, there was no evidence he acted with the other Norteños in the car, rather than on his own initiative.

We first address whether substantial evidence shows a taking occurred.  It does.

At trial, the witness testified someone jumped out of the passenger side of a car, ran directly toward the bus stop in a hostile manner, explaining "I thought he was going to fight somebody at the bus stop."  The car waited, blocking the witness's car.  The following testimony then ensured:

> "I seen this guy come up to a gentleman that was waiting to get in the bus stop, and he snatched something out of his hand.  He went to snatch something out of his hand.  I don't know if it was a wallet, a cell phone.  I couldn't tell what it was.

15

"I don't know if he actually got it or not, but he walked away. Then he walked away and started going back to the vehicle he got out of. And he was laughing like he thought it was funny. So they jumped in the car, and they drove off.

"He was walking casually back to the car. He wasn't running, you know, none of that. It wasn't like he was trying to get [away]. He was just casually walking back to the car, got in. And so we started following him."

Under further questioning, the witness emphasized he was not sure whether the man (Anthony) actually obtained anything. He was "not sure. I'm not sure if . . . he tried to snatch it and it fell to the ground or if the guy, you know, retrieved it back. I'm not sure if he got away with it or not." "[L]ike I said, I don't know if he got it or not." He thought "there was a little struggle there like he was trying to kind of retrieve it, you know, like fighting for it almost. . . . It was a quick snatch, and he kind of bounced back from it, and that was it." He was clear that the alleged victim was not a willing participant.

This testimony in isolation supports the defense claim that no substantial evidence supports a taking. However, as counsel for Daniel forthrightly details in his brief, in the 911 call, the witness said the man (Anthony) did grab something out of the alleged victim's hands. The People attempted to refresh the witness's recollection with his 911 call, which was played to the jury. The witness agreed he was describing things on the recording as they occurred, and that his memory would have been better at the time of the 911 call, but when asked whether the recordings refreshed his memory "as to whether or not the person who took the item actually got a hold of some item," the witness answered, "No. It doesn't refresh anything, no."

In the 911 transcript, two voices can be heard, one evidently the driver, and the other, the witness. We have listened to the recording, and the transcript cited in the briefing is accurate. The witness says, "Uh, I seen he went up and grabbed . . . something out of a guy's hand that was getting on a bus." "It was the passenger. He jumped out,

16

went to the bus like he was gonna get on and jumped -- he grabbed some -- snatched something out of the guy's hand and took off running." The driver (Daniel) was black, and the passenger-robber (Anthony) was white, with "shaggy" hair. The robber "grabbed something out of the guy's hand and then started laughing and ran back to the vehicle and they took off." It could have been a wallet or a cell phone, but the witness was not sure.

During final arguments, the prosecutor repeatedly emphasized that "in the 911 call [the witness] is very clear that he sees property being taken. I know in Court he said I can't really remember if something was actually taken or not. But the day it happened, he was very clear that something was indeed taken, so thus a completed robbery." The prosecutor then argued Daniel drove Anthony away from that robbery. Daniel's counsel argued the witness's in-court testimony was more persuasive, particularly given that there was no victim in court and no stolen property found in the car. Anthony's counsel, too, argued the trial testimony was more credible.

Thus, the 911 recording was critical. The jury was permitted to consider it as evidence, indeed, no objections were interposed, nor would they have succeeded. (See Evid. Code, §§ 770, 1235, 1240.) Given that the witness testified his memory was better at the time of the incident than at the time of trial, the jury could rationally credit the 911 statements, to the effect that an actual taking occurred, and disregard his ambiguity at trial on this key point. Based on that call, substantial evidence of a taking was shown.

Next, we consider whether force or violence was used. (See *People v. Gomez* (2008) 43 Cal.4th 249, 254 [to "elevate larceny to robbery, the taking must be accomplished by force or fear and the property must be taken from the victim or in his presence"].) Again, the 911 call is important, because the witness reported a "little struggle" as if the parties were "like fighting for it almost." He was clear that the alleged victim was not a willing participant. This, although perhaps not overwhelming, was substantial evidence from which the jury could rationally infer Anthony forcibly grabbed property from the victim.

17

Finally, we address whether there is substantial evidence Anthony acted together with another gang member (Daniel), rather than spontaneously on his own.

The evidence shows that after Anthony left the car, it remained in place, blocking the witness's car, supporting the inference that Daniel aided him by acting as the getaway driver. This view is bolstered by the evidence of flight, in which a police helicopter was used to locate the defendants.[6] Robberies are one of the gang's principal activities, and given that there were *five* Norteños in the vehicle, it is rational to infer Anthony did not act on a whim. He then casually returned to the car where the others waited, laughing. Of course, we agree not every crime committed by a gang member is necessarily committed for the gang, but from all of the facts herein, the jury could rationally conclude this particular robbery was not some frolic and detour by Anthony, but was committed in active furtherance of gang activities, by members of the Norteño gang. (See § 186.22, subd. (a).)

---

[6] As the People point out, robbery is not complete until the perpetrators reach a place of relative safety. (See *People v. Anderson* (2011) 51 Cal.4th 989, 994.)

## DISPOSITION

The judgments are affirmed.

                                        /s/
                              Duarte, J.

We concur:

      /s/
Murray, Acting P. J.

      /s/
Renner, J.