Filed 11/12/20  P. v. Krupnick CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

| California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. |
| --- |

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA ELI KRUPNICK,<br><br>    Defendant and Appellant. | D076493<br><br><br><br>(Super. Ct. No. SCD279486) |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon Majors-Lewis, Judge.  Affirmed.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Joshua Eli Krupnick guilty of burglary (Pen. Code, § 459)[1] with the further finding the burglary was of an inhabited portion of a building (§ 460, subd. (a)) and that someone other than an accomplice was present in the residence during the burglary (§ 667.5, subd. (c)(21)). The trial court sentenced Krupnick to a six-year prison term.

Krupnick contends that the trial court prejudicially erred by excluding testimony from a witness who claimed to be an expert in facial comparison. The witness had authored a report comparing screen shots taken from security camera videos at the scene of the burglary with current photographs of Krupnick to assess whether Krupnick was the burglar. We conclude that the trial court did not abuse its discretion in excluding the expert's testimony, as the poor quality of the screen shots from the security camera videos, along with the fact the expert was familiar with Krupnick only from recent color photographs, made the expert's opinion speculative and unreliable. Accordingly, we affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

E.M., A.L. and their children lived in a single family house, with an attached garage, in San Diego. At approximately 1:30 a.m. on May 24, 2017, someone entered the garage, presumably using a remote garage opener that E.M. had left in her unlocked car that was parked in the driveway. A motion-activated security camera installed on the front of the garage captured short video clips of the burglar as he walked into the garage, left with items, and then returned several times over the course of approximately 30 minutes to take more items. The security camera produced low quality videos. Although

---

[1] Unless otherwise indicated all further statutory reference are to the Penal Code.

a viewer can discern a thin white man with very short hair committing the burglary, the video image is very dark and grainy.

On the morning after the burglary the family noticed that the garage door was open and a chair had been lodged under the door knob of the door leading from the house into the garage. The items missing from the garage were two bicycles, a bicycle frame, two skateboards and snowboarding accessories. The bicycles were high-value custom-built bicycles that A.L. had assembled himself, and the bicycle frame was a rare high-value carbon fiber frame with distinctive bright red coloring and yellow lettering.

On the day of the burglary, E.M. posted the security camera videos on the neighborhood social-media application Nextdoor to ask if anyone recognized the burglar. E.M. received numerous responses to her post, including from Krupnick's former girlfriend, J.W., who told E.M. that she recognized Krupnick in the security camera videos and that Krupnick lived right around the corner from E.M. and A.L. Indeed, Krupnick lived four or five houses away from the family's house.

The day after the burglary, E.M. and A.L installed a better quality security camera, with night vision. A week later at 4:20 a.m., the new security camera captured a man crouching behind a car in the family's driveway. The man crouching in the driveway shared characteristics with the person depicted on the video during the burglary, as he was also a thin white male with very short hair. The picture quality of the video from the new security camera was better than the video of the burglary, as it was not as dark, but the video was still very grainy.

Approximately two months after the burglary, A.L. was driving past Krupnick's house on the way back home, when he looked into Krupnick's open garage. A.L. testified that as he was driving by, he saw his distinctive

bright red bicycle frame in Krupnick's garage, along with at least 20 other bicycles. Around October 2017, A.L. discovered that one of his stolen bikes was being sold in a thrift store and that the same thrift store had also sold his red carbon fiber bicycle frame.

On November 29, 2018, a complaint was filed alleging that Krupnick committed the burglary of E.M. and A.L's garage. The operative information charged Krupnick with burglary (§ 459), with the further allegations that the burglary was of inhabited portion of a building (§ 460, subd. (a)) and that someone other than an accomplice was present in the residence during the burglary (§ 667.5, subd. (c)(21)).

At trial, the jury was shown the security camera videos from the night of the burglary along with the video captured a week later of the man crouching in the driveway. The jury was also shown mug shot photographs of Krupnick taken on September 13, 2017, less than four months after the burglary. The testimony at trial established that Krupnick's appearance at the time of trial was different than it was during the time period of the burglary, as he had longer hair at trial and was not as thin in the face and body.

E.M. was familiar with Krupnick's appearance because he was a neighbor. E.M. testified that she did not initially identify Krupnick as the burglar in the videos, but after she received information from other people directing her attention to Krupnick, she viewed the videos and came to the conclusion that Krupnick was the person in the videos on the night of the burglary and a week later. E.M. explained that she viewed the videos numerous times, and she formed the opinion that the person depicted was Krupnick because of "the pattern like his widow peek and certain patterns in his hair."

4

A.L. testified that he also had seen Krupnick in the neighborhood. A.L. did not immediately identify Krupnick in the videos of the burglary, but after receiving information from neighbors, A.L. looked more closely at Krupnick when he saw him in the neighborhood, reviewed the videos again, and concluded that Krupnick was the burglar.

Krupnick's former girlfriend, J.W., testified that she dated Krupnick between June 2015 and March 2016. J.W. explained that when she viewed the videos of the burglary that E.M. posted on Nextdoor, she knew the burglar was Krupnick. J.W. explained, "I knew from the movement, to the hairline, to the shape of the head." After the prosecutor played the videos of the burglary during J.W.'s testimony, J.W. stated that she had no doubt and was "100 percent certain" that Krupnick was the person in the videos. J.W. explained that she was very familiar with Krupnick because she dated him, and she stated, "I can tell from the side of his face to the shape of his skull and the hairline with the side burn. I know it's him." While J.W. was testifying, the prosecutor showed her the video of the man crouching in the driveway a week after the burglary. J.W. testified that Krupnick was not the person in that video.[2]

The jury was informed that Krupnick had a history of committing theft using a remote garage opener. Specifically, on February 21, 2017, Krupnick

_____

[2]    At trial, defense counsel attempted to attack J.W.'s credibility by presenting evidence that J.W. had incurred two theft-related convictions, one of which J.W. explained was based on receiving stolen property that Krupnick gave to her. Defense counsel also presented testimony from a defense investigator who interviewed J.W. a few days before trial. J.W. told the investigator that she was "pretty certain" when she originally saw the security camera videos that they depicted Krupnick, but she was currently only 50 percent certain. The investigator did not play the videos for J.W. during the interview.

drove into a gated underground parking garage at a college apartment complex when the gate was open due to another car exiting. In the parking garage, Krupnick and an accomplice took items from more than one unlocked vehicle, including a remote garage opener. On July 8, 2017, Krupnick drove into the same parking garage, apparently using a remote garage opener, as the gate was not already open when he approached. Krupnick and an accomplice took items from an unlocked vehicle.

Krupnick's defense was premised on evidence that the burglary was committed by Krupnick's friend, J.S., while Krupnick was at home with other friends. Specifically, Krupnick's friend L.L. testified that at the time of the burglary, he was at Krupnick's house playing video games with Krupnick and two other people. According to L.L., J.S. came by Krupnick's house while they were playing video games and told them that he had just taken things from a nearby home, including a skateboard and a bicycle. L.L. also testified that shortly after the burglary a friend showed him the videos that E.M. posted on Nextdoor and he watched the videos again in preparation for his testimony. L.L. could tell by the "strut," "walk" and "body movement" of the person in the videos that the burglar was not Krupnick.

During closing argument, defense counsel encouraged the jury to look closely at the videos taken during the burglary to identify differences between the burglar and Krupnick. Among other things, defense counsel argued that the person in the videos was not Krupnick because Krupnick's nose and ears were different from the burglar's.

The jury convicted Krupnick of burglary as charged. The trial court sentenced Krupnick to an upper term of six years in prison.

II.

DISCUSSION

Krupnick argues that the trial court prejudicially abused its discretion by excluding the testimony of an expert witness proffered by the defense, who planned to testify about his comparison of screen shots extracted from the security camera videos with recent photographs of Krupnick.

A.    *Background*

1.    *Johnson's Report*

Defense counsel filed a motion in limine to admit the "expert testimony of Steven Johnson, Vice President of Ideal Innovations, Inc., a biometric and forensic analysis company that provides facial recognition analysis to, among other federal agencies, the Federal Bureau of Investigation[]."[3]  The People filed their own motion in limine to exclude Johnson's testimony.

Defense counsel's in limine motion attached a report prepared by Johnson describing his comparison of three recent color photographs of Krupnick with three black and white screen shots from the security camera videos.  The recent color photographs of Krupnick that Johnson used in his comparison were good quality, high resolution images showing Krupnick's profile and the back of his head.  In the photographs, Krupnick's hair is significantly longer than the hair of the person depicted in the security camera videos, whose hair is cut very close to his head.

One of the screen shots that Johnson used in his comparison is from the videos taken during the burglary.  As reproduced digitally in the appellate

_____

[3]    Johnson's curriculum vitae was not attached to the motion in limine, but the court received it as an exhibit at the conclusion of the in limine hearing.  Johnson's curriculum vitae states that in 2013 he received 80 hours of facial recognition and comparison training from the Department of Defense.

7

record, the screen shot from the night of the burglary that appears in Johnson's report is extremely dark, and it is hard to make out any detail. Only the outline of a man's profile is discernable along with faint indications of a hairline. Although we cannot be certain how the quality of the photograph appearing in the appellate record compares with what was presented in the trial court, we note that the trial court described the quality of the screen shot during the in limine hearing as "a grainy, unclear, dark unknown," "a black, grainy film" a "shady gray washed-out picture." Johnson's report acknowledges that the screen shots were of "very poor quality." We have viewed the video from which the screen shot was taken, and we note that it is also extremely dark and grainy. As Johnson's report acknowledged, the quality of the security camera videos "was exceptionally poor and resolution was marginal."

The two remaining screen shots used by Johnson for his comparison are not from the burglary at all, but rather from the video taken a week after the burglary, showing a man crouching by a car in the driveway. Although the screen shots from the week after the burglary are of better quality than the screen shots from the night of the burglary, they are still very grainy.

In Johnson's report, he undertook to collectively compare all three screen shots with Krupnick's three recent color photographs to determine whether Krupnick was the same person as the person in the screen shots. In making his comparison, Johnson did not distinguish between the one screen shot from the night of the burglary and the two screen shots from a week later. Instead, Johnson assumed that the same person is shown in all three screen shots, and he compared the three screen shots as a group with Krupnick's recent photographs, collectively labeling all three screen shots as "unknown."

8

Johnson's report does not indicate that he used any automated system, such as facial recognition software, to compare the photographs. Indeed, there is nothing in Johnson's report to suggest that he used anything other than his own observational abilities to compare a list of facial characteristics between the two sets of images. The list of facial characteristics was comprised of "Skin," "Face/Head Outline," "Face/Head Composition," "Hair," "Forehead," "Eyebrows," "Eyes," "Cheeks," "Nose," "Ears," "Mouth," "Chin/Jawline," "Neck," "Facial Hair," "Facial Lines," "Scars," "Facial Marks," and "Alterations." For seven of the categories ("Eyebrows," "Cheeks," "Chin/Jawline," "Neck," "Facial Lines," "Scars," "Facial Marks") the report indicated that no comparison at all was possible due to poor image quality. For the categories of "Skin," "Face/Head Outline," "Face/Head Composition," "Hair," "Eyes," "Ears," and "Mouth" the report indicated that Johnson's ability to perform a comparison was limited by the poor image quality. The only categories for which the report did not note poor image quality as a limiting or disqualifying factor was "Forehead," "Nose," "Facial Hair" and "Alterations." [4]

In describing the results of his analysis, Johnson's report acknowledged that "[t]here is currently no standard conclusion scale for face comparisons." However, in reporting his conclusion, Johnson used a scale ranging from

_____

[4] Two examples are illustrative of the nature of Johnson's comparison in instances where the image quality allowed any comparison at all. With respect to the "Forehead" category, Johnson's report stated, "The forehead of [unknown subject] and [known subject] appear different in contour with brow ridge of the [unknown subject] appearing more prominent than that of the [known subject]." With respect to the "Eyes" category, the report stated, "due to quality and non-frontal of [unknown subject], the details of the eyes are not comparable; the placement of the eyes on the face and under the brow ridge appear similar."

positive 3, which signified that "[t]he observations strongly support that it is the same person" to negative 3, which signified that "[t]he observations strongly support that it is not the same person." Using this scale, Johnson arrived at a rating of negative 1, concluding, "After comparing the probe image to the candidate . . . the determination is that the probe image *has support to some extent that it is not the same person* (-1)." (Italics added.)

Every page of the report contained the following disclaimer as a footer: "The Facial Identification information is presented as a courtesy to be used only for informational purposes and is not represented to be error free. Ideal Innovations, Inc. makes no representations or warranties of any kind with respect to the provided Facial Identification information, such representations and warranties being expressly disclaimed."

2. *The In Limine Hearing and the Trial Court's Ruling*

The trial court and the parties engaged in an extensive discussion during in limine motions about whether Johnson would be permitted to testify. The trial court explained at length that it believed Johnson's opinion was too speculative and unreliable because it was based on a comparison of very poor quality screen shots with very good quality recent photographs of Krupnick.

The court made numerous statements during the hearing explaining its view that Johnson's opinion was too speculative and unreliable. Among other things, the trial court explained, "[T]he comparison [of the] photos with the surveillance [is] unreliable because the surveillance photos are fuzzy. They are not clear. You can't tell a thing. It's worthless. Yet the actual genuine photographs are beautiful, color, clear, concise; so you're using a very accurate photograph to compare to a grainy, unclear, dark unknown." The trial court stated to defense counsel, "There is no way I can think of that an

10

expert can come in . . . and say whether that person on that grainy picture . . . is or is not your client.  I wouldn't be able to tell if it is or is not your client.  . . .  You can't see any distinct features."  The trial court also told defense counsel, "I'm worried about the poor quality of your comparison with the real, and I don't think it's reliable.  That is my concern."

Looking closely at Johnson's analysis of the list of facial characteristics and the qualifying language Johnson used in making his comparisons, the trial court explained, "Everything in this comparison is all speculation.  . . . So then he comes up with 'it's not him' when everything he has done along the way is total speculation.  . . .  This is unreliable under any kind of standard you can look at based on his own report.  It was a nice effort, but it's not going to fly with the jury based on the basic rules of evidence that the jury can't speculate and use conjecture."[5]

During the course of the hearing, the trial court also expressed concern that Johnson's opinion might be inadmissible because it did not meet the standard for admission of expert testimony based on a new scientific technique.  Under the test set forth in *People v. Kelly* (1976) 17 Cal.3d 24, 30 (often referred to as the *Kelly/Frye* test) " 'the proponent of evidence derived from a new scientific technique must establish that (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used.' " (*People v. Jones* (2013) 57 Cal.4th 899, 936 (*Jones*).)  However, at the in limine hearing, the court ultimately did not base its ruling on that ground, as

---

[5]     At the outset of the hearing when giving its preliminary views on why Johnson's testimony was inadmissible, the trial court also referred to the disclaimer that appears on each page of Johnson's report, stating that the opinion "sounds like it's all speculative based on their disclaimer."

it concluded that regardless of whether the technique employed by Johnson was subject to the *Kelly/Frye* test, Johnson's opinion was unreliable and speculative because of the poor quality of the security camera videos.

During the sentencing hearing, the trial court again explained why it had excluded Johnson's testimony.[6]  The trial court stated, "The photographs that you provided to your expert were actual real photographs of your client, excellent photographs.  Then there were some snippets from the surveillance video that I felt were pathetic and not very clear, dark, really undiscernible who was really in there for sure.  And my take is, first of all, assuming that facial recognition testimony can be given, in this particular case, [with] those comparative items, the surveillance and then the very clear pictures of your client, I don't see how anyone could make any opinion about it, period, including someone who purports to be a facial recognition expert."

For the first time at the sentencing hearing the trial court also stated that it excluded Johnson's testimony because "there is no *Kelly/Frye* information about this new technology for facial recognition."  The trial court explained, "I had my legal division look it up . . . , and I could find nothing where facial recognition was described in the realm of *Kelly/Frye* scientific evidence."  The trial court stated, "I wanted you to know that I did do research, and there is absolutely no cases that my legal department could

---

[6]     The trial court addressed the issue at the sentencing hearing because Krupnick had filed a motion to dismiss in the interest of justice pursuant to section 1385 on the ground of factual innocence, to be considered at the sentencing hearing.  In his motion, Krupnick characterized the trial court's reasons for excluding Johnson's testimony, stating that the court based its ruling on its view that "the surveillance video images were 'not clear enough for <u>anyone</u> to make a determination as to who the subject in the video was.' "  The trial court disagreed with that characterization and accordingly took the opportunity at the sentencing hearing to clarify the basis for its ruling.

find that said that it has been subjected to *Kelly/Frye* and the cases that were discussing it were not allowing it."[7]

B.  *Standard of Review*

"A claim that expert opinion testimony was improperly admitted or excluded is reviewed on appeal for abuse of discretion." (*People v. Banks* (2014) 59 Cal.4th 1113, 1190.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it,' " but the trial court must exercise its discretion "within the confines of the applicable legal principles." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)

C.  *The Trial Court Was Within Its Discretion to Exclude Johnson's Opinion Because It Was Unreliable and Speculative Due to the Poor Quality of the Images*

"The Evidence Code provides the framework for the admissibility of expert opinion evidence. 'If a witness is testifying as an expert, his testimony

---

[7] The trial court referred to "this new technology for facial recognition" when commenting that Johnson's opinion may not be admissible under the *Kelly/Frye* test because the court had not uncovered any case law allowing expert opinion based on facial recognition technology. However, we see no indication that Johnson used any technology to conduct his analysis, such as facial recognition software. Instead, Johnson appears to have used the same non-technical observational skills available to any person. " 'The *Kelly* test is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 317.) The test applies only " 'to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*People v. Leahy* (1994) 8 Cal.4th 587, 605.) We need not, and do not, reach the issue of whether the *Kelly/Frye* test would apply to analytical technique Johnson used in his facial comparison analysis.

13

in the form of an opinion is limited to such an opinion as is:  [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion.'  (Evid. Code, § 801.)  An opinion based in whole or in part on an improper matter may be excluded.  (*Id.*, § 803.)" (*Apple Inc. v. Superior Court* (2018) 19 Cal.App.5th 1101, 1117 (*Apple*).)

"In *Sargon*, our Supreme Court built on prior interpretations of these statutes and provided definitive guidance to courts considering the admissibility of expert opinion evidence.  '[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.'  (*Sargon, supra*, 55 Cal.4th at pp. 771-772.)  'This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning.  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." '  (*Id.* at p. 771.)" (*Apple, supra,* 19 Cal.App.5th at p. 1118.)  "The court must . . . determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture."  (*Ibid*.)  "The goal of trial court gatekeeping is

14

simply to exclude 'clearly invalid and unreliable' expert opinion." (*Sargon, supra,* 55 Cal.4th at p. 772.)

In its ruling, the trial court explained that it was excluding Johnson's testimony because of the extremely poor quality of the screen shots used by Johnson in his analysis, which made Johnson's opinion speculative and unreliable. In so doing, the trial court relied on a sound legal ground for excluding Johnson's testimony. As set forth in *Sargon,* a trial court may exclude expert opinion that is "speculative," "unreliable," and "based on matter of a type on which an expert may not reasonably rely." (*Sargon, supra,* 55 Cal.4th at pp. 771-772.)

In addition to being based on a sound legal ground, the trial court's ruling was also based on a sound factual ground. Based on our own review of the security camera videos and the screen shots as they are digitally reproduced in the appellate record, we concur with the trial court's assessment of the image quality as being too poor to support a reliable and non-speculative expert opinion. The images are dark and grainy, and it is hard to make out anything except very basic features on the burglar's head and face. Indeed, Johnson's own report acknowledges that the screen shots were of "very poor quality," and that the quality of the security camera videos from which the screen shots were taken "was exceptionally poor and resolution was marginal." Moreover, the content of Johnson's report makes clear that the poor quality of the images made it difficult for Johnson to perform any meaningful comparison with the good quality color photographs of Krupnick. As we have explained, Johnson was unable to perform any comparison at all for seven of the 18 categories on his list of facial characteristics, and his comparison for seven other categories was limited by the poor image quality. For only four of the 18 categories was Johnson able

15

to make a comparison that he did not describe as either limited or altogether precluded by the poor image quality.

For an expert opinion to be admissible, it must be "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b)); see also *Sargon*, *supra*, 55 Cal.4th at pp. 771-772 [trial court may exclude expert opinion that is "based on matter of a type on which an expert may not reasonably rely"].) The trial court did not abuse its discretion in determining that no reasonable expert could conduct a reliable and non-speculative facial comparison using the screen shots from the security camera videos. Even for someone like Johnson, who had training in facial recognition and comparison, the images were not of a sufficient quality to allow a meaningful analysis, and all of the uncertainties and limitations expressed in Johnson's report confirmed that to be the case. Moreover, the opinion was unreliable and speculative because Johnson did not have any familiarity with how Krupnick looked at the time of the May 2017 burglary, and instead used recent photographs taken around the time of his April 2019 report.

Krupnick concedes that "the trial court noted correctly that the video quality was poor." However, he argues that *even though* the images from security camera were of poor quality, the trial court should have admitted Johnson's testimony because it allowed lay witnesses (J.W., E.M. and A.L.) to testify that they identified Krupnick in the videos.[8] According to Krupnick, if the video quality was good enough to allow the lay witnesses to testify about whether Krupnick was depicted in the videos, the quality of the screen shots

_____

[8] Krupnick does not challenge the trial court's ruling admitting the testimony from the lay witnesses regarding their identification of Krupnick in the videos.

16

from those videos was good enough to allow Johnson to form an admissible expert opinion. As we will explain, we reject Krupnick's argument.

As an initial matter, different rules govern the admission of opinion testimony by lay witnesses. Evidence Code section 800 provides, "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." " '[T]he identity of a person is a proper subject of nonexpert opinion . . . .' " (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) Appellate court "decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Ibid.*, citing *People v. Mixon* (1982) 129 Cal.App.3d 118, 130-131; *People v. Perry* (1976) 60 Cal.App.3d 608, 613; *People v. Ingle* (1986) 178 Cal.App.3d 505, 513.) "Where the photo is unclear, or the defendant's appearance has changed between the time the crime occurred and the time of trial, or where for any reason the surveillance photo is not conclusive on the identity issue, the opinion testimony of those persons having knowledge based upon their own perceptions (Evid. Code, § 800, subd. (a)) of defendant's appearance at or before the time the crime occurred is admissible on the issue of identity, and such evidence does not usurp or improperly invade the province of the trier of fact." (*Ingle*, at p. 513.)

In contrast, as we have discussed, expert witness opinion testimony must be "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) No such limitation exists with respect to lay witness testimony, as a lay witness may express an opinion on the identity of someone appearing in a surveillance video, as long

17

as the lay witness's opinion is rationally based on personal perception. (*Id.*, § 800; *Leon*, *supra*, 61 Cal.4th at p. 601 ["It is undisputed [the lay witness] was familiar with [the] defendant's appearance around the time of the crimes"].) All of the lay witnesses who testified at trial and identified Krupnick in the security camera videos explained that their identification of Krupnick was based on their personal familiarity with him, either as a neighbor or as a former boyfriend.

In addition, the opinion of the lay witnesses were not as vulnerable to the possibility of speculation and unreliability as Johnson's opinion because the lay witnesses based their opinion on different information. For one thing, unlike Johnson whose only knowledge of Krupnick was from recent color photographs of Krupnick's profile and the back of his head, the lay witnesses based their opinion on their personal knowledge of how Krupnick looked around the time of the burglary and their familiarity with Krupnick as a person, including Krupnick's mannerisms and how he walked and moved. Moreover, unlike Johnson who relied solely on screen shots, the lay witnesses based their opinions on the videos themselves, which showed Krupnick in movement, and thus gave the lay witnesses a better basis for comparison. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067 ["It is one thing to see a single photo of a person and attempt to identify that person based on it. But, here, the manager saw 20 to 30 videos of defendant, during which time he could observe such distinguishing characteristics as defendant's posture, gait and body movements."].)

Finally, it was appropriate for the trial court to exclude Johnson's opinion testimony even though it admitted the opinion testimony of the lay witnesses because expert opinion poses special dangers that the trial court must guard against that is not present in the case of lay witness testimony.

18

" '[L]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials.' " (*Jones, supra*, 57 Cal.4th at p. 952.) It was reasonable for the trial court to exclude Johnson's testimony to the extent Johnson purported to base his opinion on a special technique of facial comparison analysis, when, in fact, his opinion was too unreliable and speculative to meet the standards for admissibility. Unlike an expert opinion that a jury may hesitate to question, when a jury hears testimony from a lay witness identifying a defendant in a surveillance video, if the jury has also viewed the video, it can easily decide whether to credit or discredit the layperson's opinion based on its own assessment of whether the defendant appears in the video. (*Leon, supra*, 61 Cal.4th at p. 601 [lay witness testimony identifying the defendant in a surveillance video was admissible, in part, "because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant"].)

In sum, we conclude that even though the trial court admitted lay witness testimony identifying Krupnick as the person in the security camera videos, the trial court did not abuse its discretion in excluding Johnson's expert opinion that the images he reviewed "support to some extent" that Krupnick was not the person in the videos.[9]

---

[9] " 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. McDowell* (2012) 54 Cal.4th 395, 425-426.) The People contend that in addition to being speculative and unreliable, Johnson's testimony also could have been excluded because it did not assist the trier of fact by presenting any information or analysis that the jurors could not have obtained by simply looking at the images themselves. The trial court did not exclude Johnson's testimony on that basis, and we need not, and we do not, address whether that possible ground for exclusion has merit.

DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.